RICHMOND *et al.* v. THE DUBUQUE AND SIOUX CITY R. R. Co. *et al.*

1. **Injunction:** IN ORDINARY ACTION: EQUITABLE JURISDICTION. Sections 3788, 3789 of the Revision, authorizing in certain cases the issuing of an injunction, in an ordinary action, do not confer upon the law courts either general or special chancery jurisdiction, or

Richmond v. The Dubuque & Sioux City R. R. Co.

| | |
|---|---|
| 33 | 422 |
| 132 | 169 |
| 132 | 170 |
| 33 | 422 |
| 135 | 311 |
| 33 | 422 |
| 136 | 718 |
| 33 | 422 |
| 138 | 485 |

power to grant new remedies beyond that of issuing and enforcing an injunction against the repetition of breaches of contract or other injuries which constitute the foundation of actions pending therein.

2. Equitable jurisdiction: SPECIFIC PERFORMANCE: CONTRACTS. Equity will not take cognizance of a cause for the purpose of enforcing the specific performance of a contract, unless something more is to be effected thereby than the mere payment of money or something resulting therein.

3. —— If the courts of law can render adequate relief by awarding damages for the breach of the contract, which will fully compensate the plaintiff for his injury, equity will not interfere or exercise jurisdiction. To authorize the jurisdiction, it must appear that an award of damages would fail to compensate the plaintiff.

4. —— It seems that, if it were made to appear that under the rules prevailing in the law courts, the amount of damages could not be accurately ascertained, equity might on that ground take jurisdiction; but not so when the difficulty of proving and ascertaining the amount would be as great in chancery as at law.

5 —— So, too, equity will not grant specific performance of a contract, in a case where such performance would compel the defendant to pursue a course that would result in subjecting him and the public also to delays, inconvenience and loss. The plaintiff will be left to his recovery of damages in an action at law.

6. —— MUTUAL COVENANTS. Nor will equity require a defendant to specifically perform covenants of a personal character where, from any cause, by a like proceeding instituted by defendant, the plaintiff could not be compelled to perform his part of the covenants.

7. —— MULTIPLICITY OF SUITS. While a court of equity will sometimes take jurisdiction of a cause in order to avoid a multiplicity of suits, yet, this ground for the exercise of chancery powers is not of such controlling nature as to require the jurisdiction to be assumed in disregard of other equitable principles.

8. Practice: ERROR IN KIND OF PROCEEDING: WAIVER. Where a proceeding has been commenced in chancery, which should have been commenced at law, the error will be deemed to have been waived by the defendant, unless, at the time of filing his answer, he files his motion to have the cause transferred to the proper docket.

9. —— RIGHT TO JURY TRIAL. And by failing to take steps to have the cause thus transferred to the law docket, within the time required by the statute, the defendant will be held to have waived his right to a jury trial. MILLER, J., dissenting.

10. Estoppel: CONTRACT. Where the parties to a contract have mutually recognized its binding force upon them, by performance in part

of its conditions, and otherwise, each will be estopped thereby from denying its obligation upon both.

11. Contract: INDIVISIBILITY OF. The Dubuque and Sioux City Railroad Company and an elevator company, at the city of Dubuque, entered into an agreement containing the following stipulations: That the elevator company would erect a building suitable "for receiving, storing, delivering and handling all grain that shall be received by the cars of said railroad company, not otherwise consigned." In a supplement to this contract, it was further provided that the elevator company should "receive and discharge for the said railroad company *all through grain* at one cent a bushel," etc, and that the elevator should have the handling of all through grain at that price per bushel. It was also provided that in case the grain was held in store for the railroad company more than ten days, then the elevator company should have therefor a certain per cent per bushel. The contract, by its terms, extended for a period of fifteen years, and, at the option of the railroad company, it was to be extended fifteen years more, but no times of payment were provided for therein. In an action against the railroad company, to recover damages for its refusal to give the elevator the handling of grain according to the contract, it was argued that the contract, and the consideration which the plaintiffs were to receive thereunder for handling the grain, was entire and indivisible, and that no recovery could be had against defendants until the expiration of the contract; but the court *held* otherwise.

12. —— *Held*, also, that a judgment in such action would constitute no bar to an action for *future* breaches of the contract.

13. —— Further *held*, that the contract in question was not an unlawful restraint upon the duty of defendant, as a common carrier, in the delivery of the grain shipped to the different consignees thereof.

14. —— It was also *held*, that the fact that a part of the "through grain," transported by defendants, was carried under direction of the shippers, to the effect that it should not pass through plaintiff's elevator, did not excuse defendants from liability for their failure to let plaintiff have the handling of such "through grain," in accordance with the terms of the contract.

15. —— AGAINST PUBLIC POLICY: MONOPOLIES: COMMERCE. *Held*, also, that the contract was not inoperative, as being in contravention of public policy, on the ground that it gave to the elevator company a monopoly of handling all the through grain transported over defendant's road.

16. —— Nor on the ground that it was in conflict with the public commercial policy of the country, as defined by the act of congress

Richmond v. The Dubuque & Sioux City R. R. Co.

of June 15, 1856, authorizing railroads "to connect with roads of other States, so as to form continuous lines" of transportation from one State to another; and the laws of congress allowing the erection of certain railroad bridges across the Mississippi river. The acts of congress referred to do not *require* railroad companies to connect their lines so as to form continuous routes; they merely permit this to be done and protect them when that course is pursued.

17. —— MEASURE OF DAMAGES. In the estimation of damages in the present case, the court *held*, that plaintiffs were entitled to recover not only for loss of profits, which would have resulted to them had the "through grain" been delivered as per contract, but also for loss of profits resulting from plaintiffs being deprived of the *storage* of the grain, as stipulated. COLE, J., dissenting.

18. —— INTEREST. Interest may be considered as an *element* of damages, in order to arrive at what will be a just compensation for the injury sustained, when it would not be proper to allow it *eo nomine*. Under the peculiar facts of the present case, interest was disallowed.

19. Legal tender: TREASURY NOTES. The act of congress of July 16, 1862, making United States treasury notes legal tender, in payment of debts contracted both before and subsequent to the passage of the act, is constitutional.

20. Practice: MISTAKE IN FORUM. Where an action, properly triable at law, is placed upon the equity docket and tried as a chancery cause, the defendant having failed within the proper time to have it transferred to the law docket, the action will, in its trial and review on appeal, be governed by the rules and practice applicable to equity causes.

*Appeal from Dubuque District Court.*

SATURDAY, FEBRUARY 24.

THIS action was commenced January 23, 1868, at law, to recover damages upon a certain contract made and entered into by and between the defendant, The Dubuque and Sioux City Railroad Company, a corporation under the laws of Iowa, and The Dubuque Elevator, another corporation of this State. The plaintiffs have become the owners of the property of the Dubuque elevator, and the assigns of all its interest in and to the contract aforesaid,

by proper assurances executed December 5, 1866. The contract, which is the foundation of the action, is embodied in two written instruments which were executed at the date and in the words, as follows:

*Contract between the D. & S. C. R. R. Co. and the Dubuque Elevator, made August 22, 1860.*

Said railroad company lease to the Dubuque elevator in consideration of the covenants and agreements hereinafter set forth, a piece of ground for the erection of a grain elevator and grain store-house, for the term of fifteen years from the date hereof.

Said land is to be mutually selected by the parties hereto, on the depot lands of said railroad company in Dubuque; and to be sixty-five feet square or thereabouts, but liable to be increased in case the business of the country warrants it, as hereinafter mentioned.

The Dubuque elevator shall have the exclusive possession of said land, so long as they comply with the terms of this lease.

The Dubuque elevator covenant and agree:

1st. That they will erect a building suitable for receiving, storing, delivering and handling all grain that shall be received by the cars of said railroad company, not otherwise consigned; and that they will, from time to time, make such additions thereto as the amount of the business to be done may require.

2d. That they will pay said railroad company the yearly rent of $5.

3d. That they will not charge for receiving, storing, delivering and handling grain, higher rates than are charged in the same business at Chicago, Illinois; but the business shall be conducted upon the same terms as may be usually charged at Chicago from time to time.

4th. That, at the expiration of fifteen years, the Dubuque

elevator will, at the option of said railroad company, accept of and enter into a renewal of this for another fifteen years, exactly on the same terms as this lease, or accept in full payment for their buildings, machinery and property necessary for the receiving, storage, delivery and handling of grain and the conducting of such business, the amount for which the same by an appraisal may be ascertained to be worth.

The Dubuque and Sioux City Railroad Company covenant and agree to maintain the Dubuque elevator in the peaceable possession of said premises so long as they abide by and perform the covenants of this lease; and further covenant that they will not erect a similar building, namely, a building for the receiving, storing, delivering and handling of grain in the city of Dubuque; and further covenant that they will not grant or lease to any other party or parties during this lease the right to erect any such building in Dubuque.

And it is understood and agreed that this instrument is entered into by said parties in their own behalf, and in behalf of their legal representatives respectively, and binding on them and their legal representatives as fully and effectually as if expressly so written in the covenanting clauses.

Witness the hands of the officers of the companies and the corporate seal.

HERM. GELPEKE,
President.

JAMES M. McKINLAY,
Sec'y D. & S. C. R. R. Co.

JNO. R. THORNE,
President.

## SUPPLEMENT.

The Dubuque elevator agree to receive and discharge for the Dubuque & Sioux City Railroad Company all

through grain at one cent a bushel, and shall make no charge for storage unless the grain is in store more than ten days. In case the grain is held in store for the rail-road company for more than ten days, the Dubuque eleva-tor shall have one cent a bushel for the first ten days (or fraction of ten days), following the ten days without charge, and shall have one-half cent a bushel for every additional ten days or fraction of ten days.

And the Dubuque & Sioux City Railroad Company agree that the Dubuque elevator shall have the handling of all through grain, and agree to pay the Dubuque elevator one cent a bushel for receiving and discharging thereof as aforesaid. And agree to pay for storage, as aforesaid, when the same exceeds ten days.

This agreement to continue until the expiration of the contract to which it is supplementary.

Witness the hands of the officers of the companies, and the corporate seal of The Dubuque & Sioux City Railroad Company.

HERM. GELPEKE,
*President.*

JAMES M. McKINLAY,
    *Sec'y D. & S. C. R. R. Co.*

JNO. R. THORNE,
*President.*

*January*, 1861.

---

On the 13th day of September, 1867, the Dubuque & Sioux City Railroad Co. leased to the Illinois Central Railroad Co. its road and other property. In this lease, the last-named corporation undertook to assume the con-tracts above set out between the elevator and the first-named railroad company. The petition, as a cause of action upon the said contract, alleges that, since the first day of October, 1867, when the Illinois Central Railroad Co. commenced operating the Dubuque & Sioux City

Railroad, under the aforesaid lease, large quantities of "through grain" have been received at points west of Dubuque, and transported over said road to points east of that city, without permitting plaintiffs to handle the same at their elevator, and without paying them the compensation stipulated in the contract for the handling of this grain, as well as the sum to which they are entitled for storage under the contract. Simultaneously with their petition at law, plaintiffs filed a petition setting out the pendency of their action for damages, and the continual and daily violation of the contract sued on by defendants, as set out in the first petition; that, on account of these acts of defendants, plaintiffs are deprived of the benefits and profits from storing and handling the grain which the contract provides shall be delivered to them; that plaintiffs are unable to ascertain the amount of "through grain" transported by defendants, a fact peculiarly in the knowledge of defendants, which they refuse to disclose, and plaintiffs have no means of ascertaining the same; that, as long as defendants continue to violate the contract in the manner charged, plaintiffs will be unable to ascertain the amount of "through grain" that would continue in store under the terms of the contract for more than ten days. Plaintiffs aver that they have been, at all times, ready and willing to perform the contract, whereby they have incurred great expense; that great and irreparable damage is being done them by the continued breaches of the contract, and that they have no adequate remedy at law. Plaintiffs pray that defendants be enjoined from delivering or transferring, otherwise than through their elevator, any "through grain" transported upon the said railroad, during the time the contract may continue in force.

Defendants answered these petitions, alleging divers defenses, among others, that the contract, which is the foundation of the action, is in restraint of trade and com-

merce, and in contravention of public policy, creating a monopoly detrimental to the public interest, and is therefore illegal and void; and that the Dubuque & Sioux City Railroad Company possessed no authority under its charter to enter into the contract. It is further alleged that the transfer of grain through plaintiffs' elevator is attended with delay in time and the loss of grain, etc., which was detrimental to the business of the railroad, and caused constant complaints by its shippers. The answer also denies the material allegations of the petition.

On the 28th day of March, 1868, upon the issues thus presented, there was a trial and verdict for plaintiffs, and judgment rendered thereon in the sum of $3,446.82. The court denied the injunction prayed for, but ordered that defendants file, with the clerk of the court, semi-monthly reports of all " through grain " transported on the Dubuque and Sioux City Railroad, not otherwise consigned to parties residing in Dubuque. From this judgment both parties appealed to this court, each assigning errors upon the judgment and rulings of the district court. Upon a hearing here the judgment upon plaintiffs' appeal was affirmed and upon defendants' appeal was reversed. 26 Iowa, 191.

On the 8th day of June, 1869, after the cause had been remanded from this court, the plaintiffs filed their supplemental petition in the district court, alleging that, after the original petition was filed, until June following, the defendants in part complied with the terms of the contract sued on, by permitting plaintiffs to handle a portion of the grain, which, by the contract, they were bound to do; but, that a large quantity of " through grain," the defendants did not, during this time, permit to pass through plaintiffs' elevator, and that, since the date last mentioned, defendants have wholly failed to deliver any through grain to the elevator and are daily violating, in that respect, the contract, and proclaim their intention to allow, in the future, no

more grain to be delivered from the road to plaintiffs' elevator. The petition further shows that the defendants have disobeyed the order of the court, requiring semi-monthly reports to be filed with the clerk, showing the quantity of grain subject to the contract. It is further shown that plaintiffs have no ·means of ascertaining the quantity of grain brought to Dubuque, which defendants are bound to deliver to them, and that the means of knowledge upon that subject is exclusively within the control of defendants; that it is impossible to estimate the damage which plaintiffs will suffer in the future during the existence of the contract, because it is not possible to determine what quantity of grain may be brought to Dubuque that should, under the contract, be delivered to plaintiffs' elevator. The relief asked is, that an account be taken of the amount of grain that has been transported by defendants, which ought to have passed through the elevator from the commencement of the suit to the present time, and that for the amount of plaintiffs' damage therefor, with the sum found due under the decision of the supreme court, judgment be rendered, and that defendants be required specifically to perform their contract; but in case they are not required so to do, they be required, by proper decree, to report from time to time the quantity of grain transported by them, which may be subject to the contracts, with liberty to plaintiffs to take issue on such reports, and to move for judgment, etc. A prayer for general relief is also added.

An amended or substituted petition recites the contract and supplemental contract, the proceedings before had resulting in the judgment above stated, the appeal to the supreme court and decision there had, and repeats, substantially, the charges and averments of the original petition to which it is an amendment. It also charges, that it is the express purpose of defendants, willfully and fraudulently, to pass grain through Dubuque without permitting the plaintiffs

to handle it, in order to compel plaintiffs to surrender and abandon their contract. It is averred that defendants, from time to time, deliver some " through grain " to plaintiffs, and they are, therefore, necessarily required to make great outlays daily to be in readiness to handle the grain so received of defendants. It is alleged that plaintiffs have sustained damage to the amount of $100,000. Substantially the same relief prayed for in the original petition, to which this is an amendment, is repeated.

The cause was subsequently transferred to the chancery docket. A motion by defendants to strike out portions of the supplemental petition was overruled. The ground of this motion is that the court had no jurisdiction to try the issues presented because the suit had not been commenced in the manner required by law. Defendants also demurred to the supplemental petition on the ground of want of jurisdiction of the court to try the issues raised, and because the petition shows no ground for equitable relief, and sets out no cause why the relief asked should not be sought in another and a distinct action. The demurrer was overruled February 22, 1870, and upon defendants' motion on the same day, judgment upon the verdict before rendered was entered in accordance with the opinion of the supreme court. The defendants were ruled to answer the petition at a fixed time. Within the time, April 15, 1870, defendants answered, denying generally the allegation of the substituted supplemental petition, averring payment and setting up the judgment recovered in the action, as a bar to further recovery. On the 23d day of December, 1870, the defendants moved the court to transfer the cause to the law docket on the ground that it is an ordinary action and defendants were entitled to a jury trial. This motion was overruled February 20, 1871. On the same day the cause came on for trial, the defendant demanding a jury, which was refused, and the court proceeded to try the action as a chancery cause.

Judgment was rendered against defendant for the sum of $57,750, being the amount of damage which the court found plaintiffs had sustained from January 23, 1868, to May 1, 1870, without prejudice to plaintiffs' claim for future damage after the last date. By proper decree, a referee was appointed to take proof and report plaintiffs' damages from May 1, 1870, and the defendants were required to keep an account at Dubuque of all "through grain" shipped past plaintiffs' elevator, in violation of the contract, and report weekly to the referee until the termination of the contract, with leave to either party, upon notice, to move for judgment and to contest the amount of damages before the referee. Leave is also given either party to move for a modification of the decree, or for other orders and injunctions upon notice of ten days, and defendants have the right to elect to have their damages assessed in gross upon proper application, and ten days' notice to plaintiff previous to any term of court. The defendants excepted to each and every part of the decree and judgment. Plaintiffs object to the decree because the judgment in their favor does not include damages sustained by them for loss of the storage of the grain, because they are not allowed interest and because the judgment does not provide that it shall be paid in coined dollars or specie.

The following entries appear of record:

On the 23d day of July, 1869, the following proceedings were had:

A. W. RICHMOND *et als.*
  vs.
DUBUQUE & SIOUX CITY R.
  R. Co. *et als.*

In this cause, plaintiffs file a supplemental petition for the transfer thereof to the equity side of the docket, and for judgment and decree in chancery. Defendants file their motion to strike out portions of said supplemental petition.

September 14, 1869. This cause coming up on defendants' motion to strike out portions of plaintiffs' supplemental petition, motion refused; defendants except.

December 6, 1869. This day defendants move for judgment on the verdict in accordance with the ruling of the supreme court; also move to strike supplemental petition of plaintiffs from the files. Demurrer to supplemental petition. By consent of parties, in open court, the same is argued and submitted, and the rulings on motions and demurrer, and judgment are to be entered in vacation as of this term, reserving right of exception to either party.

February 22, 1870. This cause now coming on to be heard, on the procedendo from the supreme court, and on the motion of defendants that judgment be entered in accordance with the opinion of supreme court; and on the motion of defendants to dismiss the supplemental petition filed by plaintiffs since the return of the cause from the supreme court; and also on the demurrer of defendants to said supplemental petition; and counsel for the respective parties being heard, the court doth consider and adjudge that the motion for judgment be sustained, and that, in accordance with the decision of the supreme court, plaintiffs have judgment against defendants for the sum of $4,-365.14 and costs, taxed at         dollars, and have execution therefor, to which plaintiffs except; and the court doth further consider that the motion to dismiss and the demurrer be and the same are hereby overruled, to which defendants except; and the defendants are hereby ruled to answer said supplemental petition on or before the 15th day of April, A. D. 1870.

February 8, 1871. This cause coming on this day, to be heard on the motion of defendants to transfer the same to the law docket, the said motion is overruled, and defendants except.

February 20, 1871. This cause coming up on the 10th day of February, A. D. 1871, on the motion of the defendants to transfer the same to the law side or docket of this

court, for the reason that there are no equitable issues raised by the pleadings in said cause, and that the matters set forth in defendants' answers raise questions which they have a right to have tried by a jury; it being admitted by plaintiffs *that, until the last term of this court, said cause was not on the equity calendar or docket of this court,* and that defendants filed their motion to transfer the same as soon during said last term of court as they became aware that said cause was on said equity side of said court, said motion having been filed on the 23d day of December, 1870; after argument by counsel and due consideration by the court, it is ordered, adjudged and decreed that said motion be and is hereby overruled. To which ruling of the court the defendants then and there excepted.

February 20, 1871. And now this suit coming on for trial, the defendants demand a jury to try the issues between the parties thereto, which the court refused to allow, but proceeded to try the cause according to the first method of trying causes, to all which the defendants then and there excepted.

The plaintiffs then offered in evidence the bill of exceptions made at the trial of the case between the same parties on the same contract at a former term of this court, to the admission of which the defendants then and there objected, on the ground of irrelevancy, incompetency and immateriality. The court overruled the objection. To which the defendants excepted, and the depositions of witnesses and other evidence being read, and the arguments of counsel heard, and the matter submitted to the court for decision :

1. It is ordered, adjudged and decreed that plaintiffs have and recover of the defendants the sum of $57,750, and costs of suit taxed at $    , in full satisfaction for their damage from January 23, 1868, to the 1st day of May, 1870, but without prejudice to plaintiffs' claim for damages after that date.

2. That D. C. Cram be appointed referee to take proofs from the parties, and report the damages to plaintiffs from May 1, 1870.

3. That defendants keep an account at Dubuque of all through grain shipped past plaintiffs' elevator in violation of the contract, and to report weekly to the referee until the termination of the contract, with leave to either party to move the court for judgment upon the report of referee, by giving to the opposite party ten days' notice previous to any term of this court. Each party to have the right to contest the amount of damages before the referee. Each party to have leave to move the court for a modification of this order, and for other orders or an injunction, upon ten days' notice to the other party previous to any term of court.

4. Defendants may elect to have damages assessed in gross, by application, with ten days' notice, to plaintiffs, previous to any term of court. Ordered, and decreed as aforesaid, the 13th day of February, 1871.

To each and every part of the foregoing decree or judgment, the defendants except.

Plaintiffs' claim for storage and for interest in the assessment of damages, and that the decree be expressed in coined dollars and parts of dollars, is disallowed, to the disallowance of all which plaintiffs except.

*Griffith & Knight* and *Platt Smith* for the plaintiffs :

The contract is not entire, but separable ; and the former recovery is not a bar. The following propositions are well settled :

1. When the contract is not entire, but separable or several, a several action may be maintained for the breach thereof, *toties quoties*, as often as a breach occurs, or as often as a continuing breach puts the defendant in default

in respect to the thing stipulated to be done or omitted by him.

2. If the breach of a several contract be of such a character as to justify the other party in regarding it as a total breach of the whole contract or covenant in all its obligations, and for the whole time it has to run, he has his *election* to consider it as total, and go for entire damages, prospective as well as present, in which case of course a recovery would be a bar to a further action. Or he may elect to regard the breach as partial, stand by his contract, and have his action for *liquidated* damages, according to the terms of the contract, as often as the breach is repeated, or as often as a continuing breach puts the other party in default in respect to any thing to be done or omitted by him. Or, in other words,

3. Where two parties have entered into a several contract or covenant, one party cannot, by his own willful, wrongful or fraudulent act, rescind it as to the other, and compel him to go for damages at large in one suit, or deprive him of his election to stand by his contract and sue *toties quoties*, as often as a breach occurs, for his damages as liquidated by the terms of the contract or covenant.

4. Whether the contract or covenant is entire or several depends on the intention of the parties, to be gathered from the terms of the contract, the subject-matter, the position of the parties, the business of each to which it may have reference, and the usual mode of conducting the same, and from all the circumstances surrounding the parties, or under or in view of which the contract was made; and the intent of the parties, when thus ascertained, determines the character of the contract, whether several or entire.

5. Where the contract is for the performance of a single and entire act for a single and entire consideration, the contract is entire; but

6. Where the obligation involves the performance of

several acts, or several parts of an entire act, or where the consideration is not one and entire, but is several, or in parts, payable at several points in time, or at several points in the progress of the performance of the thing to be done, whether by express stipulation or by implication of law, there and in each of those cases the contract or covenant is several.

In support of the above propositions, the following authorities were cited. 3 Pars. on Cont. (5th ed.) 187; 2 id. 517 and note *b ;* 2 Smith's Lead. Cas. (4th Am. ed.) 42; Sedg. on Dam., pp. 224, 225, 226, marginal; *Leland* v. *Marsh,* 16 Mass. 389; *Perkins* v. *Hart,* 11 Wheat. 237; *Mayor* v. *Pyne,* 3 Bing. 285 ; *Robinson* v. *Green,* 3 Metc. 159 ; *Sickles* v. *Pattison,* 14 Wend. 257 ; *Basler* v. *Nichols,* 8 Ind. 260 ; *Fowler* v. *Armour,* 24 Ala. 198 ; *Crain* v. *Beach,* 2 Barb. S. C. 120 ; *Beach* v. *Crain,* 2 Comst. 86, 95, etc.; *Badger* v. *Titcomb,* 15 Pick. 409 ; *Bristowe* v. *Fairclowe,* 1 Man. & Granger, 143 ; *Clark* v. *Jones,* 1 Denio, 516 ; *McConnell* v. *Kibbe,* 33 Ill. 178, 179; *Davenport, G. L. & Coke Co.* v. *City of Davenport,* 15 Iowa, 6 ; Rev. 1860, § 4128, p. 707 ; *Davenport, G. L. & Coke Co.* v. *City of Davenport,* 13 Iowa, 229 ; 2 Pars. on Cont. 658 and notes, 728 and notes; *Cambpell* v. *Consalus,* 25 N. Y. (11 Smith) 613 ; *Dibol* v. *Minott,* 9 Iowa, 403 ; *Winchester* v. *Newton,* 2 Allen (Mass.), 492 ; *Jackson* v. *Cleveland,* 15 Wis. 107 ; *Goodwin* v. *Merrill,* 13 id. 658 ; *Loomis* v. *Eagle Bank,* 10 Ohio, 327.

*Crane & Rood* and *James F. Wilson* for the defendant:

I. In the first place, the court cannot compel the defendants to perform their part of the contract without at the same time securing a specific performance on the part of the plaintiffs. The covenants on both sides are concurrent or dependent, and to be performed during a period of years after the decree is rendered. Performance, or a

readiness to perform, by the plaintiffs at all times is the very foundation upon which the liability of the defendants rests; is a condition precedent to that liability, and without which no rights can accrue to the plaintiffs. Indeed, performance, or its equivalent, by the plaintiffs, is demanded by the established maxim, that he who seeks equity must do equity, and a compliance with this maxim will be as necessary in the future to entitle the plaintiffs to a specific execution of the contract as it is at present. Notwithstanding the plaintiffs may *now* be ready and able to carry out to the very letter the obligations of the agreement, yet the court cannot know or decide that they will be ready and able to-morrow, or at any future time during the life of the contract, and hence cannot decree specific performance against the defendants.

II. In the next place, we insist that the plaintiffs have a plain, adequate and complete remedy at law, and hence have no standing in a court of equity. If the contract sued upon is entire and indivisible, as is maintained by the defendants, then the plaintiffs exhausted their remedy in the first suit. If divisible in its nature, then it must consist of as many contracts as there are divisions, and on each contract the plaintiffs have a complete and effectual remedy by action for damages.

Again, the sole and only object sought by the plaintiffs' suit is to enforce the mere payment of money, an object which the courts of law are thoroughly competent to effectuate. In Pars. on Cont., vol. 3, page 364, the author says: "It may be stated as a rule, that equity will not decree a specific performance unless something more is to be done by it than the mere payment of money, or *a thing which ends in the mere payment of money*, because the law is adequate to this." *Flint* v. *Brandon & Vesey*, 163; *Phyfe* v. *Wordwell*, 2 Edw. Ch. 51.

If the court should decree a specific performance in the present case, and compel defendants to give plaintiffs the

handling of the through grain, it would furnish them no effectual relief, unless they were also decreed to pay plaintiffs the compensation provided for in the contract. It is the latter decree that plaintiffs are really seeking, well knowing that the former would furnish no relief at all. In short, the relief sought is the mere payment of money. To this point, see *Johnson* v. *R. R. Co.*, 19 Eng. L. & Eq. 584.

III. Another insuperable difficulty, in the way of the court enforcing specific performance of the covenant to give plaintiff the handling of the through grain, is that such specific performance would result in great injury to the defendants and the shippers of the grain, with no corresponding benefit whatever to the plaintiffs. It would subject the defendants to the entire expense of handling the grain, to delays and interruptions in its business and payment of damages on account of such delays, and the owners to the losses arising from shortage caused by fraud, carelessness, or accident, and all the damages springing from an improper mixture of different qualities of grain. Now it is a doctrine of equity that the court will not grant specific performance in a case where such performance will inflict upon the defendant a greater injury than a refusal to grant such performance will inflict upon the plaintiff. Thus, in *Johnson* v. *R. R. Co.*, *supra*, BRUCE, C. J., says: "The inconvenience to the defendants, not to say to society at large, would be greater if the court interfered than the not interfering could possibly be to the plaintiffs, because all the plaintiffs require is money, and, if they are entitled to money, they will be able to recover it in the ordinary courts of law." 19 Eng. L. & Eq. 590; Adams' Equity, 5 Eq. 195, 196.

Again, as respects the defendant, the Dubuque & Sioux City R. R. Co., no decree for a specific performance can be rendered, because it is impossible for that company to perform such decree, having leased its road and delivered

possession thereof to its co-defendant in this action, of which plaintiffs had knowledge before the commencement of this suit. *Ferrier* v. *Buzick*, 2 Iowa, 136; *Tobey* v. *Bristol County*, 3 Story, 824; *Fitzpatrick* v. *Featherstone*, 3 Ala. 40; 1 Redf. on Railroads, p. 133, § 4.

IV. And, as respects the defendant, the Illinois Central Railroad Company, no decree for future performance should be entered, because it is in the power of the defendants to render said decree void or nugatory at any time. Should the railroad companies see proper at any time to change or modify the terms of the lease, so as to make the contract of the Illinois company one of strict indemnity, or so as to release the latter absolutely, it would be perfectly competent for them to do so, and the court's decree for specific performance would at once fall to the ground. *Tobey* v. *Bristol County*, *supra*; *Greason* v. *Keteltas*, 17 N. Y. 496.

V. Another fatal difficulty, in the way of the courts granting a specific performance of the covenant to give the plaintiffs the handling of the through grain, is that it would require the enforcement of continuous personal action on the part of the defendant. In respect to such duties and obligations as are of a *positive* and *personal nature* it seems difficult to perceive how courts of equity can enforce a specific performance of them, and, therefore, in case of a breach thereof, the injured party must be left to his remedy, if any, at law. Story on Part., § 224; *Port Clinton R. R. Co.* v. *R. R. Co.*, 13 Ohio St. 544, and cases cited; *Marble Company* v. *Ripley*, 10 Wall. 339; *Hooper* v. *Broderick*, 11 Sim. 47.

The court will not enforce the performance of a continuous series of duties, the non-performance of which can only be punished by repeated attachments. *Blockett* v. *Bates*, L. R., 1 Ch. App. 117. See the numerous cases cited under the next point.

VI. Another conclusive reason why specific performance

cannot be decreed in this suit is found in the want of mutuality. That such performance could not be decreed by the court against the plaintiffs in behalf of the defendants is perfectly obvious from the nature of the contract. So far as the plaintiffs are concerned, their contract is strictly one for personal services, an agreement to perform certain work for defendants during a definite period of time. That courts of equity will not enforce such contracts, see *Hamblin* v. *Dinneford*, 2 Edw. Ch. 529; *Clark* v. *Price*, 2 Wil. C. C. 157; *Kemberly* v. *Jennings*, 6 Sim. 340; *Kemble* v. *Kean*, 6 id. 333; *Lumley* v. *Wagner*, 13 Eng. L. & Eq. 257; *Clark's Case*, 1 Blackf. 122; *Haight* v. *Badgely*, 15 Barb. 501; *Sanquirico* v. *Beneditti*, 1 id. 315; *Stocher* v. *Brackelbank*, 5 Eng. L. & Eq. 67; *Johnson* v. *Railway Co.*, 19 id. 584.

Performance of the contract on the part of the plaintiffs would not only require continuous personal action, but also the exercise of skill and judgment as well as good faith and diligence. If the plaintiffs should remove beyond the jurisdiction of the court, or should refuse or become disabled through death or otherwise to perform, the court could enforce performance only by running or operating the elevator through its own agents and officers. That a court would not undertake to carry on such a business is clear from the authorities. *Marble Co.* v. *Ripley*, 10 Wall. 358; *Port Clinton R. R. Co.* v. *R. R. Co.*, 13 Ohio St. 549; *Johnson* v. *The R. R. Co.*, 19 Eng. L. & Eq. 588; *Blockett* v. *Bates*, 1 Ch. App. 117.

Should the present elevator be destroyed, the court could not procure money and rebuild it; should the increase of business require the present capacity to be doubled or trebled the court could not erect additional elevators for that purpose, or compel the plaintiffs to do so against their inclination. To decide when an increase of facilities for elevating the grain would be necessary — to determine the

nature and extent of such facilities, would be a matter of skill and judgment, for which a court would be wholly incompetent.

VII. It is a fundamental rule of equity that, when from personal incapacity, *the nature of the contract or any other cause*, the contract is incapable of being enforced against one party, that party is equally incapable of enforcing it against the other though its execution in the latter way might, in itself, be free from the difficulty attending its execution in the former. Fry on Specific Performances, §§ 286, 287; *Marble Company* v. *Ripley*, 10 Wall. 359.

The contract to be enforced must be mutual, the tie reciprocal, or a court of equity will not enforce a performance. *Olive* v. *Dougherty*, 3 Greene, 374; *McMurtie* v. *Bennett*, Harrington's Ch. Rep.; *Hawley* v. *Sheldon*, id. 420; *Hutcheson* v. *McNutt*, 1 Ham. (Ohio) 14; *Cabeen* v. *Gordon*, 1 Hill's Ch. 51; *Benedict* v. *Lynch*, 1 Johns Ch. 370; *Ohio* v. *Baum*, 6 Ham. (Ohio) 383; *Tyson* v. *Watts*, 1 Md. Ch. 13; *Bronson* v. *Cahil*, 4 McLean, 19; *Southern Life Ins. Co.* v. *Cole*, 4 Fl. 359; *Stoutenburg* v. *Tompkins*, 1 Stock. 332; *Hoens* v. *Simmonds*, 1 Cal. 119; *Duvall* v. *Myers*, 2 Md. Ch. Decis. 401; *Bodine* v. *Gladding*, 21 Penn. St. 50.

An infant cannot sue because he cannot be sued for a specific performance. The *remedy* must be mutual. *Flight* v. *Bolland*, 4 Russ. 298. Both parties must by the agreement have a right to compel a specific performance according to the advantages which it might be supposed they were to derive from it. *Moore* v. *Randolph*, 6 Leigh. 185; *Broomley* v. *Jeffries*, 2 Vern. 515; *Armiger* v. *Clark*, Bumb, 111; *Lawrence* v. *Butler*, 1 Sch. & Lef. 13.; *Hoover* v. *Calhoun*, 16 Gratt. 112.

Unless a court of equity can execute the *whole contract on both sides it will not interpose in behalf of either party*. To compel one party to perform specifically and send the other to a court of law to recover damages would be in

violation of the most established principles of equity. 16 Grat. 109, and cases there cited.

"There is no instance," said Lord HARDWICKE, in *Goring* v. *Nash*, 3 Atk. 190, of decreeing a partial performance of articles; the court must decree all or none."

It must be borne in mind that the mutuality required relates to the *remedy* as well as to the *agreement*.

Thus, where the plaintiffs had agreed to work a line of railway, keep the engines and rolling stock in repair, and to do certain other acts for seven years at stipulated amounts of remuneration, the court refused to enforce performance against the defendants, because it could not compel a performance on the part of the plaintiffs. *Johnson* v. *Railway Co.*, 19 Eng. L. & Eq. 588.

So where the owner of certain patents entered into an agreement with certain persons who, with himself, were to form a company, to the promotion of which he was to give his services for two years, and to do his best to improve the invention for the benefit of the company, and, on the refusal of these parties to go forward with the company, the patentee filed a bill for the specific performance of the agreement, it was held by the court as it would have been impossible to enforce against the plaintiff the stipulations on his part, he could not sue for specific performance. *Stoehrer* v. *Widdebrun*, 3 K. & J. 393.

So where an agreement had been made between the plaintiff and the defendant, that the plaintiff should supply certain acids for the defendant, and that the defendant should purchase from the plaintiff, and from no one else, the court refused to restrain the defendant from purchasing elsewhere, because it would not compel the plaintiff to furnish all the acids which might be required. *Hill* v. *Crolls*, 2 Ph. 60. See *Baldwin* v. *Society on Diffusion of Knowledge*, 9 Sim. 333; *Pickering* v. *Bishop of Ely*, 2 N. C. C. 249.

So when the plaintiff, an attorney, had agreed to give up

his business to the defendant, who promised to pay him a sum of money therefor, the court refused a decree for the payment of the money, on the ground that it had no means of compelling the plaintiff to perform his part of the agreement, or of putting the defendant in possession of the business. *Bozon* v. *Harlan*, 1 Meriv. 459; *Coslake* v. *Till*, 1 Russ. 376.

So where there was an agreement between two neighboring landholders to change the course of a stream, and one of the terms of the agreement was, that if any damage should accrue to the lands of the defendant from a dam which was agreed to be erected, the plaintiff would give an equivalent in land to the defendant, the quantity of land to be ascertained by arbitrators. This being a thing which the court could not do at *once*, and the court holding that the parties entering into a covenant to do it would not be a specific performance of the contract, refused to interfere, as the whole agreement could not be carried into effect. *Gervais* v. *Edwards*, 2 D. & W. 80.

The court decrees specific performance only where it can dispose of the matter by an order capable of being enforced at once. It does not decree a party to perform *a continuous duty* extending over a number of years, but leaves the opposite party to his remedy at law. *Nicholas* v. *Hancock*, 7 De. E. M. & G. 300; *Ogden* v. *Fossick*, 11 W. R. 128, L. J.

In *Blockett* v. *Bates*, L. R., 1 Ch. App. 117, the plaintiff was the owner of a colliery which was connected with the river Tyne by means of a railway about five miles in length, and laid across the defendant's land. It was agreed that the defendant should execute to the plaintiff a lease of the right to use such part of the railway as was upon the defendant's land, and that the defendant should have the right of running carriages over the whole line on certain terms, in consideration of which the plaintiff agreed to supply engine power whenever he had an

engine on the railway, and to keep the whole railway in good repair and condition during the continuance of the lease. Suit was brought to compel the specific performance of the covenant to execute the lease, which was refused by the lord chancellor in these words:

"The court does not grant specific performance unless it can give full relief to both parties. Here the plaintiff gets at once what he seeks — the lease ; but the defendant cannot get what he is entitled to, for his right is not a right to something which can be performed at once, but a right to enforce the performance by the plaintiff of daily duties during the whole term of the lease. The court has no means of enforcing the performance of these duties; all it can do is to punish the plaintiff by imprisonment or fine if he does not perform them. The form of the decree itself shows the want of jurisdiction. It does not and it could not decree a specific performance by the plaintiff of that part of the award which gives the defendant the way, leave over the whole, and a right to have engine power supplied by the plaintiff; it only declares the right of the defendant, and then awards an injunction against the plaintiff restraining him from failing to do what he is bound to do. This appears to me to be perfectly novel. If the question had merely been as to the matter of form, I should have endeavored to get over the difficulty, but it appears to me that an undertaking by the plaintiff to the same effect would be equally objectionable, for in either case the court might be called upon for a number of years to issue repeated attachments against the plaintiff for his default in performing what he had agreed to do. The same observations apply to so much of the decree as relates to keeping the railway in repair.

No attempt is made to decree specific performance, but a declaration is made of the obligation of the plaintiff, and liberty to apply is given in case of this obligation not being performed. This appears to me to be assuming a

jurisdiction, which only belongs to courts of common law, of interfering when a party has violated a legal obligation.

In order that this court may interfere, there must be mutual rights capable of being enforced by the court. Now, here, if the defendant had been willing to perform the award, and the plaintiff unwilling, could the defendant have filed a bill for specific performance of the agreement to keep the road in repair or to supply engine power? It is clear that such a bill could not be maintained. This disposes of the case, there being no mutuality."

VIII. It is also alleged that "plaintiffs have no means within their power by which they can truly ascertain from time to time what quantities of such through grain is brought to Dubuque and passed through it by defendants as aforesaid, the whole matter being exclusively within the knowledge and control of defendants, and they have the power to keep the accounts thereof to suit their views of the matter without reference to the interests of plaintiffs or of the obligation of said contract and supplement."

Now let it be conceded that plaintiffs are wholly dependent upon the defendants for their evidence. What then? Under the laws of this State, all of the agents and officers of the defendants are competent to testify and can be compelled to give their evidence. If they have the information or knowledge of the facts, the plaintiffs can obtain their testimony in the same way and to the same extent that they could that of other witnesses. There is no allegation or pretense that the officers or agents have not the information, or that no accounts are kept from which the information can be obtained; unless, therefore, the court is ready to presume that defendants will keep false and fraudulent accounts merely because it is in their power to do so, the above allegation furnishes no ground for interference by a court of equity.

IX. The covenant of the Dubuque elevator, to receive and discharge for the railroad company all through grain

at one cent a bushel, is a mere personal and collateral covenant, and does not run with the land or leased premises, so as to bind the assignee to its performance. Upon this point, see *Spencer's Case*, 1 Smith's L. C., p. 92; *Mayor of Congleton* v. *Pattison*, 10 East, 130; *Keppell* v. *Bailey*, 2 Mylne & Keene, 518; *Taylor* v. *Owen*, 2 Blackf. 301.

That this covenant is of a strictly personal nature, and hence incapable of assignment, see *Robson* v. *Drummond*, 2 B. & C. 81.

Inasmuch as the defendants could not have compelled the plaintiffs to receive and discharge the through grain, it of necessity follows that the defendants are not bound to give to the plaintiffs the handling of such grain. Unless the plaintiffs are compellable to perform on their part, there is a complete want of mutuality of obligation. That mutuality is essential to the validity or binding force of this covenant, as against the defendants, requires no argument to establish.

X. According to the principles of the common law, a common carrier exercises a sort of public employment and owes to the public various duties, independent of any special contract with his customers. It is his duty " to receive and carry all the goods offered for transportation, subject to all the responsibilities incident to his employment, and is liable to an action in case of refusal." Angell on Carriers, § 124; Redf. on Railways, vol. 2, § 158; *Coggs* v. *Bernard*, 2 Lord Raymond, 909; *New Jersey Company* v. *Merchants' Bank*, 6 How. 381; *Sandford* v. *Railway Co.*, 24 Penn. St. 380.

It is also the duty of the carrier to faithfully obey or carry out all reasonable directions given by the shipper concerning the goods intrusted to his charge. Thus, he is bound to surrender possession of the goods at any period of the transit whenever and wherever it can be done without unreasonable interference with his business. 2 Redf.

on Railways, 113, note 3 ; *Railroad Co.* v. *Sargent*, 19 Ohio St. 438; *Sager* v. *Railroad Co.*, 3 Me. 228 ; *Hastings* v. *Pepper*, 11 Pick. 41.

Even when the consignor of the goods gives directions changing their destination after shipment, it is the plain duty of the carrier to obey such directions. *Strohorn* v. *Stock Yard Co.*, 43 Ill. 427; *Lewis* v. *Railroad Co.*, 40 id. 281, and cases there cited.

The carrier is also bound to carry and deliver the goods to the consignee designated by the consignor, and a refusal to make such delivery is in itself a conversion of the goods for which the carrier is liable. In addition to cases above, see *Vincent* v. *R. R. Co.*, 49 Ill. 33 ; *The Convoy's Wheat*, 3 Wall. 225 ; *Ladue* v. *Griffith*, 25 N. Y. 366 ; Angell on Carriers, ch. 8.

Ordinarily, the carrier by land is bound to hunt up the consignee and make a personal delivery at his residence or place of business. Angell on Carriers, §§ 295, 299 ; Redf. on Railways, § 157.

Now, any contract or obligation entered into or assumed by a carrier, which is inconsistent with his faithful performance of the duties devolved upon him by the policy of the law, as essential to the protection of the rights and interests of the public at large, is necessarily illegal and void, and has been uniformly so held by the courts.

Thus, in the case of *Bennett* v. *Dutton*, 10 N. H. 481, a passenger carrier entered into an agreement with a connecting carrier that he would not receive and carry any passenger coming to the place at which the two lines connected by a line competing with the second carrier till the day following the arrival of such passengers. In a suit brought to recover damages for a refusal by the first carrier to take a passenger who arrived by the competing line, the agreement with the second carrier was set up as a defense to the action, and as an excuse for refusing to perform his duty to the passenger. The court held that a

carrier could not thus relieve himself from the performance of the duties imposed by the law, and that his contract was illegal and void, as being in contravention of sound public policy.

In the case of *The Railroad Company* v. *The People*, recently decided by the supreme court of Illinois, the relators sought to compel the railroad company by mandamus to deliver grain in bulk at their elevator, to which it had been consigned, on the same terms on which they delivered at other elevators on the line of their road, and which offered no greater facilities for delivering the grain. The defense set up by the company was, that it had entered into contract with the owners of the other elevators, wherein it had agreed to deliver grain exclusively at the elevators of the parties to the contracts. The court unhesitatingly pronounced the contracts illegal and void, on the ground that their provisions were wholly inconsistent with the performance of those duties which, as a common carrier, the company owed to the public.

When properly understood, the true meaning of the covenant under consideration is all through grain, *which the defendants have a legal right to control*, and which they can deliver to the plaintiffs consistently with the duties they owe to the public as common carriers. It is a correct rule of law that where a construction, consistent with lawful conduct and legitimate intention, can be placed upon the words of parties, it is incumbent upon the court to adopt such construction and not unnecessarily give to their words a meaning at variance with duties enjoined by law. 2 Pars. on Cont. 500, and note " *r* " and cases there cited; Chitty on Cont. page 80; *Archibald* v. *Thomas*, 3 Cow. 284; *Riley* v. *Vanhouten*, 4 How. (Miss.) 428.

Thus, a bond conditioned to " *assign all offices*" was construed to apply to such offices only as were by law assignable. *Harrington* v. *Kloprogee*, 4 Doug. 5.

So a promise by an executor to pay a simple contract

debt, " whenever sufficient effects are received from the estate of the deceased " was construed to mean whenever sufficient effects *legally applicable to the payment of such debt* were received, and the executor was allowed to pay a debt by specialty first. Chitty on Cont. 76 and 273; 2 Pars. on Cont. 499, and note " *q*," and cases cited.

In the case at bar, the evidence shows that the consignors of nearly all the grain involved in this litigation, at the time of the shipment, directed the defendants not to allow the same to be passed through the plaintiffs' elevator. These directions being reasonable, and capable of execution without any interference with the rights or interests of the defendants, it was their clear legal duty to obey them. The doctrine that the common carrier must obey the reasonable directions of the shippers, and deliver to the consignees by them designated, is sustained alike by sound public policy and a uniform current of decisions.

Shall it be presumed in the present case that the parties to the contract intended to stipulate for a violation of public duty and an open defiance of the laws of the land; or shall that construction be given to the contract which comports with a due regard to the rights of shippers, and a proper observance of the duties and obligations placed upon the defendants by the principles of the law? *Fremont* v. *Stone*, 42 Barb. 169; *Spinks* v. *Davis*, 32 Miss. 152; *Twells* v. *R. R. Co.*, 12 Am. Law Reg. 729; *Stanley* v. *R. R. Co.*, 18 Ohio, 559.

XI. In the present action, the plaintiffs charge the defendants with having violated two different covenants contained in the contract. That is to say, first, that they have refused and neglected to pay plaintiffs the one cent a bushel for handling grain; and second, that they have not permitted or allowed them to have the handling of said grain.

Now, as to the covenant to pay the one cent a bushel for handling the grain, we, in the first place, insist that it has nothing whatever to do with the plaintiffs' cause of action

except so far as it may restrict or limit the amount of damages in case of recovery. Their cause of action is just as complete and perfect without this covenant as with it, and if it were entirely stricken from the contract, the plaintiffs' rights would remain precisely the same, except so far as said covenant might affect or modify the measure of damages.

XII. In the next place, we insist that the consideration which plaintiffs were to receive for handling the grain was *entire* and *indivisible*. That is to say, one cent a bushel for all the through grain received, during the continuance of said contract. The consideration is just as clearly entire as if the agreement had been to pay plaintiffs a fixed or definite sum of money for the whole work to be performed. On the face of the written instrument, the agreement is, that an *entire work shall be done*, and, in consideration thereof, *an entire sum or price* shall be paid. The completion of the whole work being a condition precedent to the right to demand payment of the price. If the contract were to handle for one cent a bushel all through grain coming in on train number four, or on car number ninety, or all through grain that may be received on defendants' cars during the next fifteen days instead of fifteen years, no one would doubt that the whole work of handling the grain would have to be done before the plaintiffs could demand the compensation for their services.

Yet the only difference in the two cases is the length of time during which the contract is to continue. That this is not sufficient to convert an indivisible agreement into a divisible one is too apparent for argument.

Now the principle of law is well settled that, "unless there be some express stipulation to the contrary, whenever an entire sum is to be paid for the entire work the performance or service is a condition precedent; being one consideration and one debt it cannot be divided." In the absence of any stipulation by the parties, as to the time of

payment, the legal presumption is, that payment is to be made when the work is completed. This is a fair and just rule of law, and is clearly applicable to the facts of this case.

In this view we are sustained by the authorities. Thus, in the case of *The Steam Packet Co.* v. *Sickles & Co.*, 10 How. 440. Sickles & Co. were the owners and patentees of a machine commonly called "Sickles Cut-off," and designed to effect a saving in the consumption of fuel used for the generation of steam.

They placed one of their machines, at their own expense, on one of the Packet Company's steamboats, agreeing that it should remain there so long as the boat should last, or during the life of the patent, which then had about twelve years to run. For the use of the machine, the Packet Company was to pay Sickles & Co. the cost of putting up the machine out of the first savings effected in the consumption of fuel, and three-fourths of all the savings thereafter effected during the twelve years. The court held this to be an agreement to pay *an entire sum*, payment to be made *when the work was completed*. In giving the grounds of their decision, the court say: "The contract is *wholly silent* as to when any account shall be rendered or payments made. The defendants have not agreed to pay by the trip, or settle their account every day or week or year, or at the end of twenty-seven and one-half weeks, the time for which this suit is instituted. It is one entire contract which cannot be divided into a thousand, as the plaintiffs imagine." In that case, the contract was continuous, extending through many years, the money was earned from day to day, and the reasons urged in favor of successive payments quite as strong and of the same nature as in the case at bar. Still the alleged impropriety that the parties intended to defer for so long a period as twelve years, the payment of money being thus earned from day to day, was not deemed by the court a sufficient reason to

warrant them in disregarding the ordinary legal presumptions or in deviating from the recognized rules for the construction of contracts. The same was equally true of the argument, that it ought to be presumed from the usual and ordinary course of business, that the parties intended that the payments should keep pace with the work. In the case of *Cunningham* v. *Jones*, 20 N. Y. 486, the plaintiff agreed to build an addition to defendant's brewery. The contract was by parol, and without any stipulation in regard to the sums to be paid or *the time of payment*, excepting that the labor was to be performed by days' work. Under this contract, plaintiff worked about two years, and then left the job in an unfinished state, when the defendant took it in hand and finished it on his own account. During this time plaintiff received of defendant the sum of $400. The suit was for the balance earned under the contract. It was held that plaintiff could not recover without full performance on his part — that no times of payment being fixed by the contract it must be presumed that payment was to be made only on the completion of the work. The court thought that the usual and familiar mode of doing such business was not sufficient to overthrow a clear legal presumption as to the time of payment.

In *McMillan* v. *Vanderlip*, 12 Johns. 165, the plaintiff agreed to work for the defendant ten and a half months, and spin yarn at three cents per run, and afterward left the service of the defendant and brought an action against him for spinning 845 runs at three cents per run. *Held*, that the contract of the plaintiff was entire, and must be performed as a condition precedent to his recovering any part of the compensation for his services.

In *Davis* v. *Maxwell*, 12 Metc. 286, HUBBARD, in delivering the opinion, says: " The plaintiff has argued that it was a contract for seven months at $12 per month, to be paid at the end of each month. But, however reasonable

such a contract might be, it is not, we think, the contract proved. *There is no time fixed for the payment, and the law, therefore, fixes the time,* and that is, in a case like this, the period when the service is performed. It is one bargain, performance on one part, and payment on the other, and not part performance and full payment for the part performed. The rate per month is stated, as is common in such contracts, as fixing the rate of payment in case the contracts should be given up by consent, or death, or casualty, should determine it before its expiration without affecting the rights of the parties."

In *Larkin* v. *Buck,* 11 Ohio St. 562, after an elaborate review of the cases, it was decided that the court below erred in charging the jury that in a contract to labor for six months certain, at $11 per month, *the contract being silent, as to the time of payment, the law would presume that payment was to be made at the end of each month,* and it was further decided that full performance, or its equivalent, by the plaintiff was an essential condition of his right to recover.

In *Hutcheson* v. *Wetmore,* 2 Cal. 310, where the agreement was to work eight months, at $100 per month, the employer stipulating to give his note at the end of four months, payable at the expiration of the term of service, the balance of the wages to be paid at the termination of the employment, it was held that the employee could not maintain an action for any part of the compensation without showing full performance on his part. So, in *Reab* v. *Moore,* where the agreement was to work eight months for the sum of $104, or $13 per month; *held,* that as " there was no provision that payment should be made monthly or otherwise," the employee was bound to work the full eight months before he could demand any compensation. 19 Johns. 337.

So where the agreement was to do the brick work of a house at $2.50 per thousand bricks, kiln count, it was held

that the party was bound to perform the whole work before he could recover any part of the compensation. *Shanks, etc.*, v. *Griffin*, 14 B. Mon. 153.

So where the agreement was "to haul the wood to be loaded the next season," and it was to be paid for at the rate of 12½ cents per cord, it was held that full performance was a condition precedent to the right to demand payment. *Harris* v. *Ligget*, 1 Watts & Serg. 301.

So where the contract was to deliver 800 tons of coal at $6 per ton, to be delivered on board vessels, as sent for, during months of August and September. "Should we be unable to get all away by close of September, it is understood you can keep over on wharf, or bring down later, as you prefer, as much as 300 tons of above quantity." The court held the contract entire, and that payment was to be made only on its fulfillment. *Snim* v. *Bodine*, 60 Penn. St. 182.

So, in *Baker* v. *Higgins*, 21 N. Y. 396, where the agreement was to deliver 25,000 pale brick on the dock at East Troy, for $3 per thousand, and 50,000 hard brick, at the same place, at $4 per thousand, cash, it was held that a delivery of the whole 75,000 bricks was a condition precedent to the right to demand any part of the consideration to be paid.

So, in *Stephens* v. *Beard*, 4 Wend. 606, where one party contracted on the 1st of June, 1827, to saw such quantity of logs for the other party by the 1st of April then next, as would make 300,000 feet of boards, the second party agreeing to furnish the logs and pay $2 per thousand feet for the sawing thereof, no time of payment being agreed upon, it was held that an entire performance by the first party, unless prevented or excused by the second party, was indispensable to any right of action in any form on his part.

So, in *White* v. *Brown*, 2 Jones (N. C.), 403, where the contract was "to pay for three slaves $10 per month, until

we finish our contracts on the railroad," it was held that no payment could be demanded till the work on the railroad was completed. This decision is based upon the presumption or rule of construction that, where work is to be done and no time of payment is mentioned, complete performance of the work is a condition precedent to the right of payment.

So, in *Sharp* v. *Johnson*, 3 Lans. 522, an agreement to make and deliver three or four models of a mowing machine was held to be an entire agreement, and that the whole number should be made and delivered before payment could be demanded.

So, in *Stein* v. *Steamboat Prairie Rose*, 17 Ohio St. 471, where the agreement was to pay $10 per day for the use of a barge, until delivered back in like good order as received, it was held that payment could not be demanded until the time for returning the barge had arrived. No time for payment being designated in the agreement, the court held that, according to the adjudged cases, the law would fix or designate the time when the use of the barge ceased as the time for payment.

In the case at bar, the plaintiffs' agreement is to handle *all the through grain that defendants may receive during fifteen years*, at one cent a bushel. The work to be done is as clearly entire as if the agreement were to build a house, paint a portrait, construct a ship, make a turnpike or deliver a specific quantity of goods. If this be so, as no time of payment is fixed by the contract, the legal presumption, that payment is to follow complete performance, must prevail. *Sinclair* v. *Bowles*, 9 B. & C. 92.

XIII. By the foregoing authorities, the doctrine is clearly established that, on the face of the contract sued upon, the same being silent as to time of payment, the law presumes that payment is to be made only when the work is completed. Such being the judgment of the law upon the face of the instrument, parol evidence is clearly

inadmissible to change the legal import of the contract or contradict the presumption of law as to time of payment. When the operation of a contract is clearly settled by general principles of law, it is taken to be the true sense of the contracting parties, and it is against established rule to vary the operation of a writing by parol evidence.

Thus, if no time of payment be expressed in a note, the law adjudges that the money is payable immediately, and allows no oral evidence to contradict the presumption. *Thompson* v. *Ketchum,* 8 Johns. 190.

So, where a party agrees to deliver portable articles of property, and no place is specified for the delivery, the *law* fixes the place of delivery and excludes parol evidence to change it. *La Farge* v. *Ricket,* 5 Wend. 197; *Creery* v. *Holly,* 14 id. 31; *Sands* v. *Wood,* 1 Iowa, 263, 18 id. 492; *Graves* v. *Porter,* 11 Barb. 594; *Baker* v. *Higgins,* 21 N. Y. 398; *Atwood* v. *Cobb,* 16 Pick. 227; *Warren* v. *Wheeler,* 8 Mass. 97; *Harrison* v. *McKim,* 18 Iowa, 491.

XIV. In the next place, even admitting the *covenant to pay* to be divisible, the covenant to give plaintiffs the handling of the through grain is not divisible, and the damages resulting from a breach thereof must be recovered in one action.

This position is sustained alike by reason and authority. In *Dibol* v. *Minott,* 9 Iowa, 403, the agreement was to furnish ten houses to be painted, and to pay for the painting thereof $70 each. But four houses being furnished, the painter sought to recover damages for a breach of the contract. The court held the contract *to pay seventy dollars* for each house to be divisible, and declared the rule of damages to be for the houses actually furnished, the contract price, and for those not furnished *the profits* that would probably have been realized if the painter had been allowed to complete his contract. In that case, if the remaining six houses had been furnished to another workman, could the painter first employed have stood by and,

as each house was completed, brought a separate suit for damages? Most certainly not. Why should the courts allow or encourage such useless litigation? What sound reason can be urged in favor of a rule so unjust and oppressive? In what way can such an arbitrary power to thus harass and annoy an adversary benefit society, or the parties litigant?

In *Masterton* v. *The City of Brooklyn*, the defendant employed the plaintiff to furnish marble to build a city hall, which would have required for completion about five years. During that time, defendant was to make twelve different payments, amounting in all to over a quarter of a million of dollars. After working on the contract about eighteen months, the plaintiff was discharged. He immediately commenced suit and recovered his *entire damages*. In that case, what justice or good sense would there have been in allowing the plaintiff, at his own arbitrary will, to prosecute twelve different suits instead of one, to obtain redress for a single wrong. If the injured party can be made whole by a single action; if he is authorized to recover the profits that would have been realized by complete performance, why accord to him the privilege of multiplying the suits merely to harass his adversary, for it is obvious that even in the latter case the law can do no more than make him whole.

In the case of a single trespass, even though the damages are not developed till long after the commission of the wrong, and then at different successive periods, the law is well settled that only one action can be maintained. *Fetter* v. *Beale*, 1 Lord Raymond, 692. In such a case, the reasons for allowing the plaintiff to bring a multiplicity of actions are much more cogent than in the case of a contract where the payments are severable.

In contracts for personal service where a servant or employee has been absolutely dismissed from the service without cause, if suit is brought on the special contract

before the expiration of the term of service, entire damages must be recovered, as no other action can be maintained even though the compensation is payable in different installments. Thus, in *Booge* v. *The Railroad Company*, 33 Mo. 212, the defendant employed the plaintiff to act as a runner or solicitor for freight and passengers during the whole season of navigation on the Missouri river at $125 per month, *payable monthly*. After working a couple of months, the plaintiff was paid up and discharged without cause. At the expiration of two more months, he recovered judgment against the defendant for the amount that he would have earned during that time. In a subsequent suit, brought to recover his wages for the balance of the season, it was held that the first judgment was a bar, and that plaintiff should have recovered in the first suit *all the damages sustained by the dismissal.*

Under precisely a similar state of facts, the same ruling was made by the supreme court of New York, in *Colburn* v. *Woodworth*, 31 Barb. 381.

In *Clossman* v. *Lacoste*, 28 Eng. L. & Eq. 140, the agreement between the parties was, that the plaintiff should enter into the employment of the defendant for the sale of wines on commission, and should exert all his influence exclusively in favor of defendant's wines, the agreement to continue for a period of five years, and the defendant guaranteeing plaintiff £600 per annum, payable annually, as a minimum revenue from the business during its continuation; *held*, that the plaintiff might sue in any year during the continuance of the agreement for the simple non-payment of the annual sum guaranteed by the employer, but that if, before the expiration of the contract, there was an entire dismissal from the service, and the relation of the employer and employed put an end to, the plaintiff *should include in one action the whole gravamen* he would suffer by reason of such a breach of contract. In that case the difference between a breach of the promise

to pay a compensation for services actually rendered, and of the promise to retain the plaintiff in the defendant's employ during the five years, is clearly recognized and enforced in the decision rendered by the court.

In *Goodman* v. *Pocock*, 15 Q. B. 576, a clerk employed for a year, at a salary payable quarterly, was dismissed in the middle of a quarter, and immediately brought an action for the wrongful dismissal. The jury were directed not to take into consideration the services actually rendered before the dismissal. Subsequently, a second suit was brought to recover under the *indebitatus* count for the services performed during the broken quarter. It was held that the *whole damages*, including compensation for the labor performed, should have been recovered in the first suit, and that a second action could not be maintained. In that case, notwithstanding the subject received a very thorough examination, it did not occur to the learned judges that the plaintiff had an option to stand idle and bring a suit at the end of each quarter; on the contrary, they concluded that his only option was to recover *entire damages for the dismissal*, or to rescind the contract and recover the value of the services rendered. See 1 Redf. on Railways, § 141.

In *Sherman* v. *Transportation Company*, 31 Vt. 179, REDFIELD, C. J., speaking of a servant being discharged by his employer, says : " The party thus turned away may elect either to recover in a *quantum meruit* for the services actually performed, or he may sue for breach of the contract in not allowing him to fulfill his contract, in which case he recovers for part performance and *for the damages sustained by the employment not being continued*. But he is not at liberty to lie by unemployed for the remainder of the term and then claim full compensation. Notwithstanding the violation of the contract by the other party, he is still bound to make the best of his time." Much less is he at liberty to lie by unemployed and bring a separate

suit every time his fancy may suggest one.   It is his clear legal duty to exercise reasonable care and diligence to make the damages resulting from the defendant's breach of contract as small as possible.   *Hamilton* v. *McPherson*, 28 N. Y. 77; *Sherman* v. *Comstock*, 21 Wend. 457.

In *Rogers* v. *Parham*, 8 Ga. 190, the supreme court of that State held that an overseer employed for a year could maintain a suit for damages on account of a wrongful dismissal, though commenced before the end of the year, and notwithstanding the compensation was not payable till the expiration of the time of service.   In this decision, the court recognizes or rather takes for granted the distinction between the promise to pay and the promise to employ or retain in his employ the defendant, for, if the former covenant had constituted the basis of the action, it could not have been maintained till the end of the year, which was the time of payment.   To same effect, see *Wright* v. *Walker*, 37 Ala. 274.

After a very thorough review of the English cases upon the entirety of contracts, Mr. Smith, the author of the leading cases in vol. 2, page 36, *Cutter* v. *Powell*, lays down the following rules as to the rights of a clerk, servant, or agent wrongfully dismissed:

"1. He may bring a special action for his master's breach of contract in dismissing him, and this remedy he may pursue immediately."

"2. He may wait till the termination of the period for which he is hired, and may then, perhaps, sue for his whole wages, relying upon the doctrine of constrictive service; or, he may treat the contract as rescinded, and may sue immediately on a *quantum meruit* for the work actually performed."

These rules are consistent with the general principles and analogies of the law, as they contemplate but one action for one wrongful dismissal.

In *Fail* v. *McRee*, 36 Ala. 68, the plaintiff agreed to

let the defendant have all the pine timber on all his land, in a certain locality, that was suitable to make good lumber. In consideration whereof the defendant agreed to saw all said timber into lumber within a reasonable time, sell the same and pay over to the plaintiff, *annually*, one-fifth of the gross proceeds realized from the sales. The defendant, finding it more profitable to saw for other parties, refused to perform his part of the contract. For this refusal to carry out the contract, suit was brought by the plaintiff to recover damages. In that case there were two distinct covenants on the part of the defendant, one to manufacture and sell the lumber, and the other to pay over to the plaintiff, in *yearly payments*, one-fifth of the proceeds of sales. If the defendant had sawed and sold the lumber according to his contract, but had refused to pay over the proceeds at the end of each year, the plaintiff could have maintained a separate suit each year, on account of such non-payment; yet, notwithstanding the divisible nature of the covenant to pay, the court held that, for a refusal by the defendant to saw and sell the lumber, but one action could be maintained. Speaking of the nature of defendant's contract, the court said:

"The contract on the part of the defendant was *continuous* in its character, it was also *entire*, and the performance is not by the contract divided — different parties assigned to different periods of time, and the plaintiff *must recover in a single action his entire damages.*"

The defendant's obligation was to saw into lumber, and sell *all the suitable timber on all the plaintiff's land*, within a reasonable time. So far as the question of entirety is concerned, the foregoing obligation is exactly similar to the defendant's obligation *to give plaintiff's the handling of all through grain* that shall come in on defendant's cars during the next fifteen years.

In *Waterbury* v. *Graham*, 4 Sandf. 215, the defendant by letter agreed to become surety for a tenant, who

leased premises for which he agreed to pay rent in quarterly installments. No other contract of suretyship than the letter was ever signed by the defendant. The tenant failing to pay the rent, suit was instituted against the defendant to recover the rent due for a distinct quarter, for which judgment was obtained. A subsequent suit was brought to recover the rent for another quarter. It was decided by the court that a judgment in one suit was a complete bar to the right of recovery in the other.

So an agreement to pay for property by giving several promissory notes, payable at different times, is a single and entire agreement for the breach of which but one action is maintainable. 11 Gray, 168.

It must be remembered that, on the former appeal of this case, this court virtually ruled that the proprietors of the elevator were the employees or servants of the railroad company, and that a promise to give plaintiffs the handling of all through grain at one cent a bushel, for a period of fifteen years, was in effect an agreement to hire or employ them to handle or unload the grain for that period of time. That the contract is susceptible of the construction put upon it by the court, and that in legal effect and operation it creates the relation of master and servant for a definite period of time, we have no disposition to controvert. If so an absolute dismissal from the employment would entitle the plaintiffs to recover their entire damages, and one action for such dismissal would bar all further recovery on the contract.

In *Fish* v. *Foley*, 6 Hill, 54, the court held that a covenant to furnish water from a mill dam to run the covenantee's carding and fulling machine, except during the dry seasons in summer and the usual time of freezing in winter, was in its nature incapable of severance, and that a claim for damages for a breach thereof could not be split up into several demands so as to authorize the covenantee to maintain several suits therefor. In speaking of a

former recovery, NELSON, C. J., says : "The covenant may be appropriately styled a continuing contract ; yet, like any other entire contract, a total breach put an end to it and gave the plaintiff a right to sue for an equivalent in damages. He obtained that equivalent or should have obtained it in the former suit. To allow a recovery again would be splitting up an entire cause of action in violation of established principles."

In *Royalton* v. *Turnpike Company*, 14 Vt. 311, it was held that an agreement to keep a bridge in repair for twenty years for $25 per year was an entire and indivisible agreement, and that, for the damages resulting from a breach thereof, but one suit could be maintained although the contract still had twelve years to run. In delivering the opinion of the court, REDFIELD, C. J., says : "The rule of damages should have been to give the plaintiffs the difference between what they were to pay the defendants and the probable expense of performing the contract, and thus assess the entire damages for the remaining twelve years."

In *Shaffer* v. *Lee*, 8 Barb. 412, a bond conditioned to support and maintain the plaintiff during his natural life was held to be an entire contract, and that a failure to provide for the obligee, in accordance with the substance and spirit of the contract, amounted to a total breach, for which full and final damages, both past and prospective, could be recovered.

So in *Remelee* v. *Hall*, 31 Vt. 582, on a similar bond the same ruling was made.

In *Campbell* v. *Gates*, 10 Penn. St. 483, the plaintiff agreed to raise out of his own land 600 or 1,000 tons of iron ore annually, for five years, and deliver it, properly cleaned, at defendant's furnace. The defendant agreed to pay plaintiff one dollar a ton for the ore raised and two dollars per ton for hauling. On pretense that the ore was not cleaned, defendant refused to receive it. The plaintiff

brought suit to recover damages for a breach of the contract in refusing to receive the ore and to recover the value of some ore delivered to and received by the defendant. The court held that the contract to receive the ore was entire, and that but one action could be maintained for a breach thereof.

In *Crabtree* v. *Hazenbaugh*, 25 Ill. 234, the defendant agreed to allow the plaintiff to pasture a certain number of cattle on his premises at so much per head, and stipulated at the same time to furnish the cattle with water while so pasturing, the court held that the contract to furnish water was entire, and that for a breach thereof but one suit could be maintained.

XV. If the defendants' agreement had been to sell and deliver to plaintiffs *all through grain* that should be received on their cars for a period of fifteen years, the entirety of their obligation would not be questioned, although no real difference is perceptible between that and a contract to give plaintiffs the handling of all the through grain during the same time.

Thus in *Clark* v. *Baker*, 5 Metc. 452, it was held that a sale of a cargo of corn on board of a schooner — the yellow at 76¼ cents per bushel, and the white at 73½ cents per bushel, was only one contract — that it could not be divided by the classes of corn into two contracts, and much less could it be divided into separate bargains for each bushel thereof. 2 Pars. on Cont. (5th ed.) 519, note "*d*."

So in *Miller* v. *Covert*, 1 Wend. 487, an agreement to sell and deliver three tons of hay, if the vendor had so much to spare, was held to be an entire agreement, though the hay was delivered in parcels.

So in *Thompson* v. *Conover*, 1 Vroom. 329, a sale of all the corn the vendor had to sell the white at 65 cents and the yellow at 63 cents per bushel, was held to be an entire contract, and that the purchaser was not entitled to receive part without receiving the whole of the corn at the prices

fixed. *Smith* v. *Jones*, 15 Johns. 229; *Waddington* v. *Oliver*, 5 Bos. & Pul. 61; *Walker* v. *Dixon*, 2 Stark. 281; *Kingdom* v. *Cox*, 5 M. & S. 522; *Baker* v. *Baker*, 4 Dutch. 13; *Winslow* v. *Stokes*, 3 Jones (N. C.) 285.

XVI. In the next place, we insist that the plaintiffs could have recovered their entire damages in their former suit. The rule of law authorizing such recovery is stated in Sedg. on Dam. (5th ed.) 117, thus:

" Where an agreement covers a long period and is broken, there is no doubt that suit may be brought at once, nor is there any doubt that prospective damages for the whole time, covered by the contract, may be obtained." *Dibol* v. *Minot*, 9 Iowa, 403; *Thompson* v. *Jackson*, 14 B. Monr. 114; *Masterton* v. *The City of Brooklyn*, 7 Hill, 61; *Shaffer* v. *Lee*, 8 Barb. 412; *Royalton* v. *The Turnpike*, 14 Vt. 311; *Fail* v. *McCree*, 36 Ala. 61; *The Railroad Co.* v. *Howard*, 13 How. 344; *Cook* v. *Hamilton County*, 6 McLean, 612; *Myers* v. *The Railroad Co.*, 2 Curtis' C. C. 28; *Remelee* v. *Hall*, 31 Vt. 582; *Steam Packet Co.* v. *Sickles*, 10 How. 440; *Durkee* v. *Mott*, 8 Barb. 423; *Clark* v. *Mayor of New York*, 3 Barb. 288; S. C., 4 Comst. 343; *Fox* v. *Harding*, 7 Cush. 516; *Shepard* v. *The Gas Light Co.*, 15 Wis. 318; *Hinckley* v. *Beckwith*, 13 id. 31; *Hoy* v. *Gronable*, 34 Penn. St. 9; *Griffin* v. *Colver*, 16 N. Y. 490; *Cort* v. *Railroad Co.*, 6 Eng. L. & Eq. 230; *Planche* v. *Colburn*, 8 Bing. 14; *Hotchester* v. *DeLatour*, 20 Eng. L. & Eq. 230; 1 Redf. on Railways, 412.

XVII. Where there is a total breach of a contract covering a long period of time, the damages resulting from such breach are entire, and must all be recovered in one action. This principle is approved in 3 Pars. on Cont., p. 189, where the author illustrates his own views by the following example:

" A corporation hires an overseer at so much wages, and

such a share of the profits, for three years. At the end of one he is dismissed without good cause. We should call this a *final breach*, and should say *the jury should determine what he loses by the wages and profits for the residue of three years*, deducting what his time and labor may be worth for that time. The facility and difficulty of finding employment, and all other circumstances bearing upon the estimate being considered."

The true criterion in a continuing contract like the one sued upon in this action, whether there has been a total breach or not, is whether the breach is of such a nature as would authorize the party not in fault to treat the contract as so far annulled or rescinded as to release him from further performance on his part.

That is to say if the circumstances are such that the party would have the right to treat the special contract as at an end, and sue upon an implied contract for his partial performance, then he would have a clear legal right to maintain an action on the special contract for *the whole damages* on the ground of a *total breach* thereof. This principle is distinctly laid down and approved by the supreme court of Vermont in the case of *Remelee v. Hall*, 31 Vt. 585.

What violation of an executory contract will release the opposite party from further fulfillment on his part is well settled by the authorities. Thus in *Canal Company* v. *Gordon*, 6 Wall. 569, the plaintiff agreed to construct certain sections of the defendants' canal, for which the defendant promised to pay a specified compensation in monthly installments as the work progressed. It was held that a failure to make the payment on the day appointed for that purpose, constituted a breach of the contract which justified the abandonment of the work, and entitled the contractor to recover a reasonable compensation for the work actually performed.

So in *Withers* v. *Reynolds*, 2 B. & A. 882, the defendant

agreed to deliver to the plaintiff three loads of straw every fortnight during a given period of time, at 33 shillings per load, payable on delivery. After delivering several loads of straw the defendant demanded payment for the whole · amount delivered. The plaintiff paid for all except the last load, for which he refused to pay, saying that he should always keep one load on hand. On this account the defendant refused to deliver any more straw, and treated the contract as entirely annulled or rescinded. In a suit brought to recover damages for not delivering the straw, it was held that the plaintiffs' refusal to pay for the straw as delivered was a total breach of the contract that released the defendant from performance on his part.

So in the case of *Hochster* v. *De Latour*, 2 Ell. & B. 678, where the defendant hired the plaintiff to travel in Europe with him as courier for a period of three months, the service to commence at a certain date in the future. Before the arrival of the time for starting on the contemplated journey, the defendant notified the plaintiff that his services as courier would not be required. It was held, upon a careful review of the cases, that this notice by defendant of his intention not to abide by his contract authorized the plaintiff to sue immediately to recover damages as for a *total breach* of the contract.

So in the case of *Starr* v. *Liftchild*, 40 Barb. 541, where the plaintiff, who was the principal of an academy, designed to give a course of business education, undertook to instruct the defendant's son in the branches of knowledge taught at his academy, and, to enable him to do so, agreed to receive the son into his family and give him his board and lodging during an academic term of twenty-two weeks, for all which he was to be paid by the defendant at the end of three months the sum of $150. During the term the son voluntarily left the school and went home, but was taken back the day following by his mother, who requested the plaintiff to again receive him into his family

and school. This the plaintiff declined to do on that day, being Thursday, but said that he would investigate certain charges of misconduct against his pupils on the coming Saturday, and would receive the son again into the school on the Monday following. He made no proposition as to the care or maintenance of the boy in the mean time. The mother took the boy home and he never again returned to plaintiff's school. In a suit brought on the note, the court held that the plaintiff's conduct, in refusing to receive the boy till the following Monday, constituted a breach of the contract which relieved the defendant from further performance on his part.

So, also, where the plaintiff agreed to work a year for the defendant at $10 per month, and, having worked over ten months, without any cause left the employment on a Saturday, declaring that he would work no longer. On Monday he returned, and offered to complete his contract, but the defendant refused to allow him to do so. It was held that the plaintiff's temporary desertion of the service was a violation of his contract, and that the defendant was thereby discharged from all obligations to receive him again into his service. *Lantry* v. *Parks*, 8 Cow. 63, and cases cited. See, also, notes to *Cutter* v. *Powell*, vol. 2 Smith's Lead. Cas. (5th Am. ed.) 22; Sedg. on Dam. (5th ed.) 285, and notes.

" In the case of a contract to deliver certain furnace castings to a certain amount, upon a credit of a year, it was held that a refusal to *receive a load of castings* put an end to the contract as to the obligation, both to deliver the balance and to give the stipulated credit for the amount delivered; and that an action on an implied assumpsit, for the quantity delivered, might be sustained immediately. *Tyson* v. *Doe*, 15 Vt. 571.

So, in *Planch* v. *Colburn*, 8 Bing. 14, where plaintiff agreed to write a treatise for a periodical publication, which, before the treatise was completed, the defendant

discontinued. This was considered an abandonment of the contract by the defendant, or a breach thereof that authorized the plaintiff to sue at once for the reasonable value of the services already rendered. So, in *Campbell* v. *Gates*, 10 Penn. St. 483, where the agreement was to raise and deliver iron ore for five years, for so much per ton. After part performance by the plaintiff, the defendant wrote him, saying that he would not receive any more ore unless it was cleaned in the manner he insisted it should be, or a proper allowance was made for the defective cleaning. The plaintiff then tendered a load of ore, which the defendant refused to receive unless the condition named was agreed to. It was held that the defendant's refusal to receive that one load, except on a condition not contained in the agreement, wholly terminated the agreement as to the defendant's obligation to perform in the future, and at once invested him with a clear right to recover full and final damages as for a total breach of the contract."

To same effect, see *Bartholomew* v. *Markwick*, 15 Q. B. (N. S.) 711; *Hoare* v. *Rennie*, 5 H. & N. 19; *Green* v. *Hulet*, 22 Vt. 188; *Buford* v. *Funk*, 4 Greene, 493; *Bush* v. *Chapman*, 2 id. 548.

The foregoing authorities show very conclusively the correctness of the doctrine that a breach of contract is *total* whenever it is of such a nature as to wholly release the party not in fault from further performance on his part. Of course there can be no total breach without the corresponding right to total and final damages. The one is the correlative of the other, and both must of necessity exist together.

XVIII. Whenever a party sues to recover damages for the breach of a contract he must sue for and recover whatever the facts existing at the time of suit commenced will authorize him to recover, and a judgment obtained will constitute a complete bar to any further claim. The principle is well settled that " the judgment of a court of

competent jurisdiction is *final and conclusive upon the parties not only as to matters actually determined, but as to every other matter which the parties might have litigated in the cause and might have had determined.*" *Embury* v. *Conner*, 3 Com. 522; *Le Gaen* v. *Kemler*, 1 Johns. Cas. 492; *Kendall* v. *Stokes*, 3 How. (U. S.) 97; *Bagot* v. *Williams*, 3 B. & C. 235; *Drum* v. *Murray*, 9 id. 780; *Veghte* v. *Houghland*, 5 Dutch. (N. J.) 125; *Pinney* v. *Barnes*, 17 Conn. 420; *Sisson* v. *Town of Marlborough*, 31 Conn. 332; *Bendernagle* v. *Cocks*, 19 Wend. 207; *Bennett* v. *Hood*, 1 Allen, 47; *Davis* v. *Milburn*, 4 Iowa, 246.

In *Parkhurst* v. *Summer*, 23 Vt., REDFIELD, C. J., lays down the rule thus : " It is a universal rule, in regard to judgments, that all matters which might have been urged by the party before the adjudications are concluded by the judgment as to the principal parties and their privies."

If the pleadings in the former suit were not so drawn that plaintiffs could have recovered their entire damages, both past and prospective, it was an omission or oversight for which the court can furnish no relief. It was their legal duty to have their pleadings in such shape as to enable them to obtain the entire relief to which they were entitled according to the then existing state of facts. *Fish* v. *Foley*, 6 Hill, 54; *Campbell* v. *Ayres*, 1 Iowa, 257; *Kriechbaum* v. *Bridges*, id. 18; *Bendernagle* v. *Cox*, 19 Wend. 207; *Doyle* v. *Reilly*, 14 Iowa, 112; *Sisson* v. *The Town of Marlborough, supra; Casselberry* v. ——, 27 Ill. 170; *Secor* v. *Sturgis*, 16 N. Y. 554; *Hetes* v. *Irwine*, 13 Ohio, 283; *Winslow* v. *Stokes*, 3 Jones (N. C.), 285; *Goodman* v. *Pocock*, 15 Q. B. 576.

XIX. In the next place, we insist that the division of the contract sued upon, in the manner demanded by the plaintiffs, would violate the fundamental principles and established maxims of the law. It is an ancient maxim of the law that no one shall be twice vexed or sued for one and the same cause of action. It is also said that it is for

the public good that there be an end to litigation, and that the law itself abhors a multiplicity of suits. These are sound maxims and well calculated to effectuate justice between parties litigant.

The real repugnance of the law, to permitting many actions to be sustained to redress injuries for which a single action is sufficient, may be shown by numerous authorities. Thus, in *Guernsey* v. *Carver*, 8 Wend. 492, in a suit upon a running account, NELSON, C. J., after stating the principle that but one suit can be maintained upon an entire and indivisible demand, says : " This case comes within the reason and spirit of that principle. The whole account being due when the first suit was brought, it should be viewed in the light of an entire demand incapable of division for the purposes of prosecution. The law abhors a multiplicity of suits. According to the doctrine of the court below, a suit might be sustained after the whole became due, on each separate item delivered, and, if any division of the account is allowable, it must no doubt be carried to that extent. Such a doctrine would encourage intolerable oppression upon debtors and be a just reproach to the law. To the same effect, see *Stevens* v. *Lockwood*, 13 Wend. 644.

So in *Bagot* v. *Williams*, 3 B. & C. 235, the defendant, while acting as steward for the plaintiff, had received £7,000 at various times for timber sold. The agent of the plaintiff, with knowledge of the state of the account, brought suit against defendant for £3,400, and took judgment by default. In a second action, to recover the balance of the account, it was held that the claim was entire and indivisible, and the former judgment was a complete bar to the action. In *Avery* v. *Fitch*, 4 Conn. 362, HOSMER, C. J., says : " A man cannot be permitted to sever a book account, and multiply suits unnecessarily." To same effect, see *Brunnel* v. *Pinto*, 2 Conn. 431 ; *Lane* v. *Cook*, 3 Day, 255.

In *Bendernagle* v. *Cox*, 19 Wend. 206, it was held that where several and distinct covenants, contained in the same indenture of lease, were broken or violated, the entire damages resulting therefrom would have to be recovered in one action, as a judgment for damages on account of some of the breaches would constitute a complete bar to a recovery for other breaches existing at the time the first suit was brought.

So, in *Casselberry* v. *Forquer*, 27 Ill. 170, it was held that only one suit for several installments of rent due on a lease could be maintained.

In *Pinney* v. *Barnes*, 17 Conn. 420, suit was brought in the name of the county judge against a removed executor on his probate bond. The breach assigned was that he had refused, upon demand, to pay over to his successor the moneys in his hands belonging to the estate, and thereupon judgment was rendered for a certain sum and costs. On a *scire facias*, afterward brought on this judgment, it appeared that at the time of the trial the defendant then had in his hands moneys belonging to the estate and set apart for the purpose of paying certain legacies at a then future time; that at the trial no claim was made or evidence offered as to the non-payment of the legacies, the action having been instituted for the benefit of those entitled to the residuum of the estate. *Held*, that the former judgment was a bar to any claim for the legacies. To same effect, see *Veghte* v. *Hoagland*, 5 Dutch. 125; *Logan* v. *Caffrey*, 30 Penn. St. 196; *Hees* v. *Heebles*, 6 S. & R. 57; *Plattner* v. *Best*, 11 Johns. 530; *Bates* v. *Quatleburn*, 2 Nott. & McC. 205; *Bennett* v. *Hood*, 1 Allen, 47; *Trask* v. *The Railroad Co.*, 2 id. 331.

XX. The constitution of the United States confers on congress the power "to regulate commerce with foreign nations, and among the several States." This power is vested in congress exclusively, and every State law, contract of corporations, and agreement between individuals,

which can effect commerce with foreign nations, and among the States, must be held subordinate, and yield to it whenever conflict occurs. *McCullough* v. *The State of Maryland*, 4 Wheat. 316; *Brown* v. *The State of Maryland*, 12 id. 419; *Cooley* v. *Board of Wardens of Port of Philadelphia*, 12 How. 299; *Gibbons* v. *Ogden*, 9 Wheat.; *The Passenger Cases*, 7 How.; *Crandall* v. *Nevada*, 6 Wall. 35; *Veazie Bank* v. *Fenno*, 8 id. 533; Story on Cont. (3d ed.), § 545, ch. 19; *Blanchard* v. *Russell*, 13 Mass. 1; *Commonwealth* v. *Knox*, 6 id. 75.

We hold that that part of the contract between the Dubuque & Sioux City Railroad Company and the Dubuque Elevator Company, upon which this action is based, is void, because it conflicts with this commercial power of congress, and contravenes a rule of public policy established by that department of the government in pursuance thereof.

BECK, Ch. J. —The points arising upon the defendants' appeal will be first considered. The first position of counsel on that side of the case is this: The issues and questions involved in the proceedings originated by and growing out of plaintiffs' supplemental and original petitions asking equitable relief, are not cognizable in the courts of equity. This point, it is claimed by counsel, is one of controlling importance in this case, and upon it rests the very question of defendants' liability, in this form of action and in this forum, upon the contract out of which this litigation grows.

*2. INJUNCTION: in ordinary actions: equitable jurisdiction.*

The proceedings in this case, subsequent to the institution of the action at law to recover for the breach of the contract, were commenced under, and based upon, chapter 155 of the Revision. The first two of the three sections of the chapter are in the following words:

"§ 3798. In all cases of breach of contract, or other injury, where the party injured is entitled to maintain, and has brought an action by ordinary proceedings, he may, in the same cause, pray and have a writ of injunction against the repetition or continuance of such breach of contract or other injury, or the committal of any breach of contract or injury of like kind, arising out of the same contract, or relating to the same property or right, and he may, also, in the same action, include a claim for damages or other redress."

"§ 3799. In such action judgment may be given for other relief, and also that the writ of injunction do or do not issue, as justice may require; and, in case of disobedience, such writ of injunction may be enforced by attachment by the court, or, when such court shall not be sitting, by a judge thereof."

The object and effect of these sections are to confer upon the courts of law, in proper cases, power to prohibit the repetition of breaches of contracts, or other injuries which are the foundations of actions pending therein. It cannot be claimed that they confer general or special chancery jurisdiction. They simply provide a new remedy before exclusively exercised by equity courts, namely, the prohibition of certain acts which are the foundation of legal actions. Neither do these provisions extend the power of the law courts to adopt other remedies than those therein expressly mentioned. The sum of the power conferred is to prohibit the continuance or repetition of the injuries contemplated therein. This is exercised in a law action upon proper petition filed in the cause. It does not abridge the power before possessed by the same courts, to award the ordinary remedies of an action at law. The last clause of section 3798, which permits a plaintiff, in such a proceeding, to claim "damages or other redress," and the provision of the following section, which permits judgment to be given for "other relief," refer to remedies

Richmond v. The Dubuque-& Sioux City R. R. Co.

before fully within the power of the courts of law. If this were not so, and the reference is to equitable relief and remedies, the provisions would overthrow all distinctions between chancery and law, and would authorize, in all law actions, when the injuries, for which recovery is claimed, may be repeated, the exercise of chancery powers. Considering this statute, as it really is, simply a provision conferring power upon the courts of law, in certain cases, to prohibit the continuance or repetition of certain acts, we will find no difficulty in arriving at the conclusion that it does not authorize the proceedings and judgment in the case before us. The petition filed by plaintiff, praying for relief by injunction, was sufficient to give jurisdiction to the district court to exercise the power conferred by the statute. But it conferred no other jurisdiction. Now, as we have seen, the statute does not confer either general or special chancery power, it does not clothe the law courts with power to grant any other remedy, or any other relief not before possessed, except that of an injunction. If the court, in the case where this relief is sought, refuses to grant it, there is certainly no power conferred by the statute to grant other relief not within the scope of the powers of the law courts. In the case before us the court refused to grant the prohibition prayed for, but retained jurisdiction of the case as a chancery court, and proceeded to award other equitable relief. We are clearly of the opinion that no warrant for this course is found in the statute.

II. We return to consider the question, whether the action, as presented by the whole record, is cognizable in a court of equity, under the rules of chancery, independent of statutory provisions. The supplemental petition, which we will regard as presenting plaintiffs' case, as their bill in equity, in the way of relief, claims damages resulting from the violation of the contract, and, in addition thereto, the further and

2. EQUITABLE JURISDICTION: specific performance: contracts.

alternative relief that defendants either be required, by proper decree, specifically to perform the contract, or that during the continuance of the contract they be required to report to the court the amount of grain transported by them, which may be subject to the contract, and upon such reports, their correctness having been determined by issues formed thereon, judgment from time to time be rendered. A prayer for general relief is also added. The court refused the relief sought, namely, to compel, by an injunction, a specific performance of the contract. The judgment awards damages accruing to plaintiffs on account of the violations of the contract, and provides for the recovery by plaintiffs of future damages. This brings before us for determination the following questions:

1. Is the plaintiff entitled to the relief requiring defendants to perform specifically the contract?

2. If not, does the fact that the suit is instituted to obtain that relief give the court jurisdiction to render a decree for damages. Before entering upon this inquiry it may be remarked that if plaintiffs are entitled to no other relief than the recovery of the damages which they have sustained on account of the breach of the contract, they should seek redress in the courts of law, unless there be other matters connected with the case, as that suggested by the last inquiry, which would give equity jurisdiction. If it be simply a case for the recovery of damages, which may be enforced in the law courts, equity will not take cognizance thereof. It will be seen that plaintiffs' right to maintain this action, independent of statutory provisions, depends upon the solution of the questions just stated.

III. In our opinion, the contract between the parties, under the principles prevailing in chancery, cannot be enforced by a court of that jurisdiction, by compelling a specific performance, by either party violating it. It will be well, right here, at the threshhold of the discussion of this question, to state succinctly the obligations of the con-

tract bearing upon each party. They are as follows: 1. The defendants lease certain land to the plaintiffs, and assure the possession thereof to them for fifteen years. The term is to be continued, at the option of defendants, for fifteen years longer, at the expiration of the term fixed in the lease. 2. The plaintiffs are bound to erect and maintain, upon the land thus leased, an elevator of sufficient capacity to handle all grain that shall be received by defendants not otherwise consigned; the dimensions of the elevator to be increased as the business may require. 3. The defendants agree not to erect a similar building, nor lease any of these lands for that purpose, during the existence of the contract. 4. The defendants are bound to pay a fixed compensation per bushel, for handling and storing the grain delivered to the elevator, and they undertake that plaintiffs shall have the handling of all "through grain" transported by them. 5. The defendants agree, in case the lease, at their option, is not continued at the expiration of the term of fifteen years, to pay plaintiffs the appraised value of the buildings and machinery, and thus become the owners thereof.

Here is a contract having six years to run absolutely, and twenty-one years conditionally, at the option of the defendants. It was executed in August, 1860, and the supplemental petition, upon which equitable relief is asked, was filed in July, 1869. It imposes upon plaintiffs the duty of erecting and maintaining valuable buildings and machinery, of making certain additions thereto, if required, and of rendering services, in connection therewith, demanding a degree of skill. The plaintiffs, to discharge their obligations, must, all the time, possess pecuniary ability, and competency in the way of knowledge of the business, both of which must be applied to the subject of the contract with faithfulness. On the other hand, defendants are bound to deliver all "through grain" transported upon their road, to do all their business of that

kind with plaintiffs, for the time the contract shall remain in force. They are to sustain plaintiffs in the possession of the land leased, and pay the compensation fixed in the contract for the services rendered.

It is impossible to state a general rule, drawn either from principle or precedents, as to the power of equity to enforce a specific performance of contracts, respecting personal property, choses in action, and personal services. It is often said that in such cases equity will not entertain jurisdiction. But this doctrine is subject to an exception, or is rather limited in its application to cases where compensation in damages does not furnish a complete and satisfactory remedy. The rule is stated in other words, namely: When the contracting party is entitled to the subject-matter of the contract and cannot be fully compensated therefor, equity will afford relief. And it is often expressed in another form as follows: Equity will not interfere when the injured party has an adequate remedy at law. Now, in the application of the rule, as it is variously announced, the important inquiry always is, what constitutes a complete and adequate remedy, and when will this be afforded by the allowance of damages? It is sometimes said that equity will not interfere, because the law will award damages, and in other cases, that equity will interfere in cases where the law will give damages, on the ground that the party is not fully compensated thereby. The fact that a court of law will award damages, in a given case, does not deprive equity of jurisdiction. To deprive the party of an equitable remedy, the damages, recoverable at law, must be a full compensation and constitute adequate relief. Equity determines this question. We must apply its doctrines in order to pronounce the relief adequate or inadequate.

But here we find no fixed rule to guide us, other than this one, which is general in its language and application; the remedy sought must be indispensable to justice. But

Richmond v. The Dubuque & Sioux City R. R. Co.

natural justice is not meant for, upon its principles, it would, indeed, appear that all men should be required to specifically perform their contracts. The conclusion is reached, that the rules are so general in their nature, that but little aid is derived therefrom in determining whether the relief afforded by the law, in a given case, will be deemed by equity adequate. Each case is determined upon its own facts and the application of equitable principles.

In our opinion the law, in the case before us, will render adequate relief by awarding damages which will fully compensate the plaintiffs for the injury they may sustain in the future, resulting from defendants' failure to perform the contract. Plaintiffs' injury is the loss of profits resulting from the acts of defendants in withholding the grain transported upon the railroad. The profits constitute the object of the contract upon. plaintiffs' part. If they are awarded the precise amount of money which will equal their profits, they are fully compensated for the injury sustained. Now the law will award this compensation in damages. It will not do to say that, on the account of the difficulty in estimating or establishing such damages, they may not in fact be awarded. The presumption is that exact justice will be done by the judgment of the law.

Plaintiffs can assign no reason for demanding the performance of the contract, other than their right to the grain accruing to them under its provisions. In this respect it differs from the cases cited by their counsel, which we will briefly notice. In *Niagara Falls Bridge Co.* v. *The Great Western Railway Co.*, 39 Barb. 213, the defendants were bound by covenant to adopt regulations necessary to prevent evasions of plaintiffs' right to collect tolls from all, except railroad passengers. It was held that defendants should be required to perform specifically the contract, on the ground that, until defendants adopted the required regulations, it would be impracticable to ascertain plain-

tiffs' damage. In *Webber* v. *Gap*, 39 N. H. 182, defendants were restrained from interfering with a right of way to plaintiff's mill. *Taylor* v. *The Society for Establishing Useful Manufacturers*, 1 Beasly's Ch. 264, was a case of interference with water leased by plaintiff. *Belknap* v. *Belknap*, 2 Johns. Ch. 463, is a case where certain commissioners, acting under a law of the State, were about to drain a pond which would result in destruction to plaintiff's mills. *Winnipissroga Lake Co.* v. *Worcester*, 9 Fost. 442, is another case of like character, where the party, restrained by equity, threatened to remove a dam in a stream from which complainants' mills were supplied with water. As in the other cases just referred to, the court held that an injunction would be allowed to restrain a nuisance where irreparable mischief will be done if the injunction be not granted. In *Hood* v. *The N. E. Railway Co.*, L. R., 8 Eq. Cases, 665, and 5 Ch. App. 524, the defendant, the railway company, had received certain land on condition that it should be used as a first-class station. It was required by the decree in the case, to stop certain trains at the station, and thereby to perform the contract as interpreted by the court. In *Stover* v. *Great Western Railway Co.*, Y. & C. 180; 6 Jurist. 1009, the defendant was compelled to perform a contract to build an archway under its road, sufficient to permit carriages to pass. Other cases of like character, which need not be more particularly referred to, the foregoing being sufficient to indicate the principles of all, are cited in the argument of plaintiffs' counsel. In most of these cases the injuries are in the nature of nuisances, and may well be held incapable of compensation by damages. The stopping of railroad trains, and the building of an arch for a carriage-way under the track of a railway, both secured by contract, we readily understand could not be compensated for by any judgment rendered in an action for damages. Considerations of convenience and pleasure may have entered into the rights of

the plaintiffs in each case. The interference with the natural flow of water, and with rights of way, and other easements, has always been prohibited by chancery in proper cases. And the reason for the exercise of jurisdiction in such cases may usually be based upon the inadequacy of the relief afforded for such injuries by the courts of law.

It is not denied that cases are to be found, where contracts, in some respects resembling the one in this case, have been specifically enforced. But wherever this has been done upon the ground that the law afforded no adequate remedy to the injured party, it will be found that something else than money, some convenience, pleasure, collateral or contingent rights, or the like, entered into the contemplation of the parties to the contract, and to some extent constituted the consideration therefor. In such cases the injured party would, by the performance of the contract, get something more than a certain amount of money, as the consideration on his part. The cases put by Lord HARDWICK fairly illustrate the point here made. See *Buxton* v. *Lester and Cooper*, 3 Atk. 383. The illustrations are these : A ship carpenter contracts for timber for the reason, known to the other party, of its convenience. In this case the legal damage for non-delivery of the timber would not compensate him, for he would be put to expense and inconvenience in supplying its place. So in the same case if the seller had made the contract, on the ground known to the other party, of his desire to clear his land, or because of a contract which he had made so to do, the profits he would have realized would not be a just and adequate compensation for the injury.

In the case before us the handling of the grain is the duty and service to be performed by plaintiffs. Their compensation is fixed by the contract. Outside of this compensation they can receive no benefit. The money paid them as damages will be just as beneficial as the same

sum would be, if received as profits, for the actual services done under the contract.

An argument of plaintiffs' counsel on this question may be appropriately noticed right here. It is claimed that this is a case of equitable jurisdiction, because the damages for a non-performance cannot be accurately estimated at law, but must be reached by conjectures of the jury. There are cases in which jurisdiction of the court of chancery is based upon this ground. *Adderly* v. *Dixon*, 1 Sim. & Stuart, 607, 1 Eng. Ch. 608. We are not prepared to hold that it will not support the jurisdiction to show that damages, on account of required discovery to be made in the action, may be ascertained in chancery, when no evidence thereof could be had at law. If it be shown that the practice of the law courts, and the rules of evidence prevailing there, are such that the party can obtain no relief, we think, for that reason, he may go into chancery. But this state of things does not exist in this case. It is claimed that, under the authority of a court of chancery, the defendants may be required to report, from time to time, the amount of grain, subject to the contract, transported over the road. Evidence of this character, it is insisted, cannot be obtained at law, and without it the fact cannot be established. But, in our opinion, substantially the same course indicated, with the same result, may be pursued at law in order to establish the quantity of grain passing over defendants' road. The "through grain" transported by defendants, it is claimed, is within the knowledge of their officers. Such knowledge is, doubtless, based upon the books, records and papers in their possession. Upon the plaintiffs, in a law action, by proper.petition, disclosing that fact, and what they expect to prove by the introduction of such documents in evidence, the defendants will be required to produce them, or, on default thereof, the facts set out in the petition, as to the desired evidence, will be taken as admitted against the

defendants. Rev., §§ 4024, 4028. The result reached by this course is substantially the same as that arrived at by the order of the court requiring reports to the referee, by the defendants, of the quantity of grain, which, under the contract, ought to be delivered at plaintiff's elevator. In each instance the court is advised, from the same source of knowledge, the books of defendants, of the amount of "through grain." When this data is obtained the amount of plaintiffs' damage may be as well ascertained at law as in chancery, and will no more depend upon conjecture in the one court than in the other.

IV. We have announced the conclusion that, in our opinion, plaintiffs may recover full and just compensation for the injury sustained in an action at law. This consideration, of itself, is sufficient to defeat their right to claim relief in equity. But there are other obstacles in the way of enforcing a specific performance of the contract. The defendants would be compelled, if the contract should be so enforced, to pursue a course of business subjecting them to delays, inconvenience and loss, when considered in comparison with the new and improved method they have adopted. Not only would the defendants be affected prejudicially, but the public would suffer in the same way. Unquestionably, the method of transportation, without change of cars, results in great benefits to dealers in grain who send it over defendants' road, as well as to the defendants themselves. Now, if defendants are required, by a decree of this court, to go back to the old manner of doing business — to throw aside the beneficial improvements they have made — the business of the country would sustain a great injury. For this reason equity will not award to plaintiffs, as relief, a specific performance of the contract. By the refusal of this relief, however, plaintiffs are denied no substantial right, for, as we have seen, they may be fully compensated in an action at law. The view just expressed does not defeat plaintiffs of their right to recover

damages. It is in effect this: Defendants are at liberty to adopt a new method of transporting grain which is beneficial to themselves and the public, but they are held liable to plaintiffs for profits under the contract. This is not inequitable toward plaintiffs, for they are fully compensated for the loss of the profits in the damages they recover. *Johnson et al.* v. *The Shrewsbury & Birmingham Railway Co.*, 17 Jur. 1015.

V. The nature of the contract and the character of the mutual covenants present an inseparable objection to a remedy requiring specific performance. Plaintiffs' covenants, as we have seen, impose upon them an obligation to maintain, for a long period of years, buildings and machinery of considerable value; during this time they are bound to render services — to do work for defendants requiring the outlay of money, the exercise of skill, care and watchfulness, and demanding, on the part of those employed, integrity and faithfulness. These covenants are personal in their nature; they require the exercise of personal qualifications and qualities.

*3. —— mutual covenants.*

Equity will not require defendants to perform their covenants unless plaintiffs, by a like proceeding, may be compelled to perform theirs; nor will it interfere, if it appear defendants are not secure in their rights and remedies for violation thereof by plaintiffs. *Bromley* v. *Jefferies et al.*, 2 Vern. 415; *Moore's adm'r*, v. *Fitz Randolph*, 6 Leigh. 175; *Lawrenson* v. *Butler*, Schoales & Lefroy, 13; *Stokes* v. *Wedderburn*, 3 Kay & Johns. 393; *Hills* v. *Crolls*, 2 Philips, 60, 22 Eng. Chan. 59; *Baldwin* v. *The Society for diffusion of Useful Knowledge*, 9 Sim. 393, 16 Eng. Chan. 394; *Bozon* v *Farlow*, 1 Mer. 459; *Coslake* v. *Till*, 1 Russ. 376; *Johnson et al.* v. *The Shrewsbury & Birmingham Railway Co.*, 17 Jur. 1015.

Defendants could not have, against plaintiffs, a decree for specific performance. The character of the services

contemplated by the covenants, the great length of time through which the contract runs, and the perishable nature of the property which plaintiffs are required to maintain, all present insurmountable obstacles to such relief. How may equity require the personal qualities of skill demanded by the contract to be exercised? What assurance can equity give, by its decree, that plaintiffs will always be possessed of sufficient capital to carry on the business or supply the improvements and buildings required by increase in the business? What guaranty can be given that plaintiffs will always be solvent? And what course would be pursued if plaintiffs fail, from want of skill or want of money, to perform these covenants? These inquiries suggest difficulties in the way of specific relief. The force of these suggestions is increased by the consideration of the fact that, at the option of defendants, the contract may remain in force for about twenty-two years from the date of the commencement of this suit, and eighteen years from this time. *Marble Co.* v. *Ripley*, 10 Wall. 339; *Bozon* v. *Farlow*, 1 Mer. 459, *supra*; *Coslake* v. *Tell*, 1 Russ. 376, *supra*; *Blockett* v. *Bates*, 1 L. R. (Ch. App.), 116; *The Port Clinton R. R. Co.* v. *The Cleveland & Toledo R. R. Co.*, 13 Ohio St. 544; *Stoker* v. *Wedderburn*, 3 Kay & Johns. 393, *supra*; *Hills* v. *Crolls*, *supra*; *Baldwin* v. *Society*, etc., 9 Sim. 333, *supra*.

VI. It is said that equity will take jurisdiction of this case in order to avoid a multiplicity of suits between the parties. This is sometimes a ground for the exercise of chancery powers, but it is not of such controlling nature as to require the jurisdiction to be assumed even though other equitable principles are disregarded. The rule relied on is usually applied in cases where chancery has jurisdiction, for a proper purpose, of a subject-matter out of which grow other questions requiring adjudication. In such cases the parties will not be turned

*4. —— multiplicity of suits.*

over to the law which has cognizance of the matter, but it will be retained, that all rights relating thereto may be settled. 1 Story's Eq., §§ 64–67. We do not understand the mere fact that there exists divers causes of action, which may be the foundation of as many different suits between the parties thereto, is a ground upon which equity may be called upon to assume jurisdiction and settle all such matters in one suit. The case would not be different if some of the causes of action were not mature. We have never heard it claimed that equity will entertain an action upon a contract requiring the payment of money daily, monthly or yearly. Yet in such a case an action would accrue at each of such periods, and there would thus be, prospectively, a great multiplicity of actions. In the case before us, admitting the contract to be divisible, and that an action may be maintained upon every breach, this is no ground for interference by a court of chancery. If the contract be divisible, and the plaintiff has a right af action thereon, to recover money, accruing every day, equity cannot take that right from him and substitute a remedy which will award.him damages in gross for the whole amount which he may ultimately recover. The case of a bond, or other contract, upon which money is due at intervals, will serve to illustrate the principle. To avoid the multiplicity of suits which may accrue upon the instrument, chancery will grant relief to the holder, by directing payment at once, not, by decree, require payment at the times fixed by the instrument, and in default thereof award execution.

The decree in this case does not, it appears to us, accomplish the object of terminating many actions in one decree. It provides for monthly litigation before the referee, and judgments to be rendered at every.term of the court. It simply provides the manner of determining the liability of the defendant, which must be pursued in future proceedings.

VII. Having reached the conclusion that this is not a

Richmond v. The Dubuque & Sioux City R. R. Co.

case where equitable relief máy be given, another question is presented, namely : Did the district court, sitting as a court of chancery, after refusing to require the specific performance of the contract, possess the authority to award damages for the breach of its covenants ? In other words, upon· determining that equity did not demand the specific performance of the contract, did it properly exercise jurisdiction in rendering judgment for damages ? In our opinion it did not. Had it acquired jurisdiction in the case for any purpose, as for discovery, it could have retained the case and granted proper relief in the way of compensation. But, when jurisdiction is wanting for any purpose, we know of no reason which would authorize the administration of a purely law remedy. See upon this point 2 Story's Eq., §§ 796, 797.

VIII. This case assumes the aspect of a law action prosecuted in chancery and a judgment for damages recovered,

5. PRACTICE: error in kind of proceeding; waiver.

being the same relief which would have been given at law. The further order of the court, appointing a referee, requiring reports to be made of the amount of " through grain" transported by defendants, etc., etc., is in the nature of equitable relief. May the judgment and order be sustained ?

The following statutory provisions must be considered : Rev., § 2613. An error in the character of a proceeding does not cause the abatement of the action. Section 2615. The error may be corrected by the defendant if the action has been commenced by equitable proceedings when it should have been at law, upon motion made at the time of filing his answer. The case will be transferred to the law docket. Section 2619. If the motion is not made as required in the last section, the error, as to the kind of proceedings adopted, is waived. Considering these provisions, in connection with others, it will be seen that, under our system of procedure, substantial rights and remedies are regarded without reference to the form of action in which they are

enforced.   Section 2608 abolishes all forms of action, and provides that all private rights shall be protected and enforced and private wrongs redressed, by one form of proceeding, to be known as a civil action.   Under section 2872, all technical forms of actions and pleadings are dispensed with, and the rules of the Revision supersede those before applicable to such subject.   Under these provisions a judgment in an equitable proceeding will be sustained, if objection has not been made under section 2615, though the action should have been prosecuted by ordinary proceedings, *i. e.*, at law.   This is unquestionably so, if the judgment be such an one as the nature of the case demands, had it been prosecuted at law.   See *Van Orman* v. *Spofford, Clark & Co.*, 16 Iowa, 186 ; *Conyngham* v. *Smith et al.*, id. 471 ; *Taylor* v. *Adair & Goff*, 22 id. 279 ; *Parshall* v. *Moody*, 24 id. 314 ; *Van Orman* v. *Merrill*, 27 id. 476.

It is equally plain if, upon the merits of the case, the relief granted by the judgment would have been denied at law, and ought not to have been given in an equitable proceeding, that the judgment will not be sustained upon a review of the proceeding in this court.   And it will not be disputed that if the relief granted in such a case, as in the case at bar, consists of distinct orders or judgments, a part of which may be sustained under the foregoing view, and a part cannot be, this court, upon appeal, will uphold the first and reverse the last.

An argument advanced by defendants' counsel against this view of the case, or rather in support of defendants' right to have the cause tried as a law action, may be appropriately noticed here.   It is this : The right of a jury trial upon the issues in the case is secured to defendants by the law, of which they are deprived if the action is prosecuted by equitable proceedings.   That defendants possess the right claimed must be admitted. But they must pursue the course pointed out by the law in

9.—— right to jury trial.

order to secure that right.   By failing to object, at the time required by the statute, to the prosecution of the suit by equitable proceedings, they are held to have waived their right to a jury trial.   The argument demands no further attention.   The case of *Byers* v. *Rodabaugh*, 17 Iowa, 53, is a case involving the right of a trial of an equitable issue in a case on the ordinary docket, which is quite different from the trial of a law issue in an equitable action.   See and construe Rev., §§ 2615 and 2617.   The language of the opinion in that case must be, therefore, limited to the precise question involved in it.   See *White* v. *Hampton*, 10 Iowa, 238 ; *McDaniel* v. *Marygold*, 2 id. 500.

Mr. Justice MILLER is unable to assent to the conclusion we have announced on this point.

IX.   We are now brought to the consideration of the merits of the action, and to inquire whether plaintiffs are entitled to the relief awarded by the judgment and order of the court.

The objections urged against plaintiffs' right to recover 10. ESTOPPEL: upon the contract will be considered in the contract.   order they are presented in the argument of defendants' counsel.

It is first claimed that the covenant in the contract, between the Dubuque Elevator and the Dubuque & Sioux City Railroad Co., is personal, and does not run with the land leased thereby so as to bind the assignors. It is, upon this position, argued that plaintiffs could not have been compelled to handle the " through grain," and therefore defendants are not bound by the contract because of such want of mutuality.   The ready answer to this objection is, that plaintiffs and defendants have mutually recognized the contract as binding upon them, by performing its conditions as well as by temporary modifications of its terms, asked for by one party and granted by the other.   These acts, if the contract by force of its terms

would not subsist between the parties to this suit, are suffi-
cient to estop both plaintiffs and defendants from now set-
ting up its want of obligation upon either. By these acts
it becomes the contract of the parties to this suit.

X. It is next urged that the contract operates ' as an
unlawful restraint upon the duties of a common carrier,
11. CONTRACT: which plaintiffs are required to discharge.
divisibility of:
construction. It is claimed, under this branch of the argu-
ment, that, by the contract, the defendants are required to
deliver the grain to plaintiffs, which is in conflict with
their duty to deliver to the consignees thereof. But this
is neither the intention nor effect of the contract. The
plaintiffs can require defendants to deliver all grain not
otherwise consigned, and all "through grain." Goods
transported by a common carrier are delivered to the
consignee at the place of their destination. When grain,
under this contract, is carried by defendants to Dubuque,
if not otherwise consigned, it is delivered to plaintiffs,
who thereupon discharge the duties either of warehouse-
men or of the railroad in receiving and holding the grain
until delivered to the owner. Whether such duties per-
tain to the railroad or to warehousemen need not be here
considered. The grain from the elevator is delivered to
the owners. This is no evasion of or restraint upon the
duties of the carrier, for the elevator is simply a means
employed for the delivery of the grain. And so, in the
case of "through grain," the elevator is but a means
adopted to transport it or aid in its transportation. The
contract, therefore, in no manner interferes with the
discharge of the duties of a common carrier.

XI. The position is taken by defendants' counsel that
the contract in suit, as to the consideration which plaintiffs
are to receive, is entire and indivisible, and the term of
payment not being provided for in the instrument, it is to
be made when all the services covered by it are completed.

It is insisted that such is the construction the law places upon the contract.

The question here presented is one of intention of the parties. This intention may be disclosed by the language, by considering the subject-matter of the contract, and the interpretation put upon it by the parties themselves. While conceding that the language of the instrument expresses nothing from which its character in this respect may be determined, we are of the opinion that the question may be solved without difficulty upon the other grounds of interpretation. The services which plaintiffs undertook to perform were to run through a period of fifteen years, which, at the option of defendants, could be extended to thirty years. They consisted in separate and distinct acts, all of precisely the same character, yet distinct, that is, the continuous services of handling grain brought in defendants' cars. Each car load required distinct services of plaintiffs to pass it through the elevator. The compensation to be paid plaintiffs for handling each car load can be readily ascertained under the contract; so it may be ascertained for any given time during which the services are rendered. Now that payment was intended by the parties to be delayed for fifteen years, or, at the option of defendants, for thirty years, is utterly unreasonable. There is no ground for such a construction based upon the contract itself, and the question only arises from the absence of any expression on the subject. It is but fair to presume that the parties relied upon, as a rule of the contract, that equitable doctrine which is sometimes applied to the construction of contracts, namely, compensation ought to be made to one entitled thereto, as benefits are received from him. But the parties have, by their own acts, put a construction upon the instrument to the effect that payments are to be made monthly. We will readily adopt that construction, confessing that we would gladly pursue even a more dimly marked, and less certain

path, to escape a result so repugnant to reason, and in conflict with the plainest principles of justice, as the interpretation contended for by defendants' counsel.

The following authorities support the views we have just announced: *Goodwin* v. *Merrill*, 13 Wis. 659; *Badger* v. *Titcomb*, 15 Pick. 409; *Sickles et al.* v. *Pattison*, 14 Wend. 257; *Mavor, assignee,* v. *Pyne*, 3 Bing. 285; 11 Eng. C. L. 104; *Perkins* v. *Hart*, 11 Wheat. 237.

XII. The next position of the counsel of defendants is ingenious, but unsound. It is this: Admitting the covenant of defendants to pay for the services of plaintiff to be divisible, nevertheless, the covenant to deliver the "through grain" to plaintiffs is not divisible, and damages resulting from the breach thereof must be recovered in one action. It is, indeed, difficult to see any thing about this covenant other than characteristics of entire unity. The defendants are bound thereby to employ plaintiffs to do certain services and pay for them — to deliver to them grain to be handled in the elevator, and to pay for the handling. Now, it is the same covenant which binds defendants to deliver the grain that obligates them to pay plaintiff. It is, therefore, not proper to speak of the covenant to pay possessing certain characteristics, and the covenant to deliver the grain as possessing others. There is, in fact, but the one covenant. Under it defendants are bound to do two acts — deliver grain and pay money. Now, it is very plain if the covenant, as to one of these acts, be divisible, it must be as to the other. It would be a strange interpretation of the contract indeed, to hold that defendants, for a breach of this covenant in refusing to pay for handling a given amount of grain, may be liable in an action at once, but for its breach, in failing to deliver the same amount of grain, a recovery may be had, but plaintiffs' remedy for further like breaches is thereby exhausted. This is the result of the argument under con-

sideration. The covenant in question, as we have before pointed out, requires the performance by defendants of successive acts, whereby the services of plaintiffs are called into requisition, namely, the delivery of grain as it shall be transported over the railroad. Now, suppose some of these separate acts should be omitted and others performed — one day defendants would refuse to deliver the "through grain" carried by them, and the next should do so; it is very plain that plaintiffs would be entitled to compensation in the way of damages for their loss, sustained by such violation of the contract. And it is equally plain, under the doctrines we have heretofore announced, that plaintiffs would not be delayed in this remedy until the termination of the contract, but could maintain an action upon each separate breach of the contracts of this nature.

The contract must be regarded as a whole; the rights and obligations of the parties depend upon and are determined by it as a whole. One of the parties, by a voluntary breach of one or all of its covenants, cannot impose upon the other the necessity of regarding it as wholly abandoned, or treating the breach as a total breach, whereby the innocent parties would be deprived of benefits and advantages that would otherwise flow to them. They would have the right so to treat it, but the law would not compel them to pursue that course. It will be observed, upon examination of the contract, that defendants are, by its terms, bound to deliver all "through grain" transported on their road at plaintiffs' elevator. It is very plain, from the contract, that plaintiffs are bound to receive not only the "through grain," but all grain not otherwise consigned, which, for convenience, we will call "local grain." Conceding that defendants are not bound to deliver "local grain," plaintiffs, being bound to receive it, would forfeit the contract by refusing so to do. Now, the evidence clearly establishes that, while defendants refuse to deliver "through grain," they continue to deliver, under

the contract, "local grain." In this state of the case defendants, while violating the covenants binding upon themselves, are requiring plaintiffs to perform the obligations resting upon them. The performance of these obligations is beneficial to plaintiffs; under these circumstances they may elect to continue, on their part, to perform the covenants of the contract, and hold defendants liable for the actual breaches committed by them. If they pursue this course they cannot recover prospective damages, for, as the contract is not regarded as wholly abandoned, the defendants may resume the performance of their obligations under it. The authorities cited by defendants' counsel are cases where, by a total breach of the contracts respectively, they were regarded as wholly abandoned, and damages were recovered accordingly. Regarding the contract as not wholly abandoned, and the acts of defendants as not constituting an entire breach, the former judgment against them does not operate to bar recovery in this case. The breaches of the contract not being considered as entire, the defendants are liable in this action for damage accruing since the first judgment.

Revision, section 4127, is in these words: "Successive actions may be maintained upon the same contract or transaction whenever, after the former action, a new cause of action has arisen thereupon." The views above stated are certainly supported by this statutory provision, if, indeed, it does not go further. But its full force need not now be discussed.

The objection to this conclusion, urged by counsel, to the effect that it sanctions a multiplicity of suits, is answered by the consideration of the single fact, that the result is not brought about by the voluntary act of plaintiffs, but is the necessary consequence of defendants' wrongful acts. They treat the contract, as to plaintiffs' covenants, as still subsisting, and require their performance, thus making it impossible for plaintiffs to treat the con-

tract as wholly abandoned, and the breach as entire, without abandoning benefits yet to flow from the performance of the contract. Should plaintiffs treat the contract as entirely broken and abandoned by defendants, they must resort to their action for damages on account of the loss of these benefits, with the probable result of defeat, for we do not see how they could recover as to the "local grain" when plaintiffs do not refuse to deliver it, or submit to the loss of profits growing out of that branch of the contract. This the law will not require.

XIII. Another position of defendants' counsel is stated, in their own words, as follows : "Performance of the contract became impossible, by the Dubuque & Sioux City Railroad Co., the moment the lease of its road and rolling stock was executed and delivered to the Illinois Central Company. By the act of leasing the road the former company deprived itself of the power to give plaintiffs the grain to handle, and necessarily committed a total and absolute breach of the contract by thus rendering performance in the future impossible." This objection is not based upon facts. The first-named company, in the contract with the other corporation, provides for the performance of the contract, thus, instead of treating it as violated, expressly contracting against its violation. The lease, instead of being an act of abandonment of the contract, is one to secure its performance. It is obvious that this affords no grounds to the defendants, at least, to claim that the contract is broken, wholly or in part.

XIV. The evidence discloses the fact to be, that a great part of the "through grain" transported by defendants, since the trial in which the first judgment was rendered, was carried under directions of the shippers, to the effect that it should not be sent through plaintiffs' elevator. Counsel now contend that grain carried under such instructions from the shippers was not subject to the contract. It is claimed that the contract requires defendants to deliver,

Richmond v. The Dubuque & Sioux City R. R. Co.

at plaintiffs' elevator, only such "through grain" as they have a right to control; that, when the shippers direct it to be transported in a different manner, defendants are not bound to deliver it under the contract. But there is no such provision as this in the *instrument*, which provides, in express terms, that plaintiffs shall have the handling of "*all through grain.*" If the shippers really have control of the grain, after it is received by the defendants for transportation, so far as to dictate the manner thereof, it does not excuse defendants for the non-performance of the contract. They undertook that plaintiffs should have the handling of all such grain, and thereby became warrantors against any interference of the shippers which would divert the grain from plaintiffs' elevator.

There is another reason why these directions of the shippers should not excuse defendants for the violation of the contract. The evidence clearly establishes that such directions were given by the procurement of defendants themselves, with the obvious intent of defeating the plaintiffs in this action, and of excusing future breaches of their agreement. Defendants cannot be permitted to take advantage of the directions of the shippers obtained by such collusive and unfair interference on their part, even should the law require the grain, after it is delivered to the carrier, to be handled in the manner dictated by the consignor.

XV. It is argued with great confidence, and at great length, that the contract in this case is in conflict with public policy, and therefore void. The same objection was urged against the contract, on the ground that it operated to create a monopoly, when the case was before in this court. We held the contract valid. 26 Iowa, 191. The decision then made, as to the questions involved, must be considered final. But the contract is now claimed to be in conflict with the public commercial policy of the country, and therefore void. This

objection is grounded upon certain acts of congress. The first one is the act of June 15, 1866, passed under the constitutional authority conferred upon congress, to regulate commerce among the several States, authorizing railroads " to connect with roads of other States, so as to form continuous lines for the transportation " of " all passengers, troops, government supplies, mails, freight and other property on their way from one State to another State." The other congressional laws are the acts allowing the erection of certain railroad bridges across the Mississippi river, among which is the Dubuque bridge. Under these statutes the respective bridges are required to be free to the trains of all railroads terminating thereat, for reasonable compensation.

It is claimed that the objects of these acts are to secure to travel and freight going from State to State, through lines of transportation without change of cars. We are prepared to assent to this statement of the object of this congressional legislation. We fail, however, to find in these acts any provisions requiring railroads to connect so as to form such continuous lines, or requiring the cars of one to be hauled over the roads of another. Without expressing any opinion upon the authority of congress so to legislate, it is very plain that these statutes have not that effect. They simply authorize the railroad corporations so to conduct their business, and thereby exempt such a course from local interference or prohibition, on the part of State or municipal legislation. They do not command connection by railroads ; they simply permit it. It cannot be claimed that, under these laws, the Dubuque & Sioux City Railroad and The Illinois Central, without the mutual consent of the respective corporations, would constitute a continuous through line, which could be used by either company. If no contract existed between these corporations, the public would receive no benefit, in the way of continuous transportation, from these laws. Again, while the law of congress authorizes the erection of the Dubuque

bridge, and declares it shall be used by the trains of all railroads, for a reasonable compensation, it does not compel the railroads to use it. If the railroad corporations that are defendants to this suit should, to-day, determine to return to the use of ferry boats or plaintiffs' elevator, in case no contract with the railroad bridge company is in the way, the acts of congress would not prevent it. They do not, as before remarked, require railroads to be operated as continuous lines—they simply permit it, and protect them when that course is voluntarily adopted. Suppose the elevator, to-day, should offer inducements, at the expense of shippers, and to the advantage of the railroad companies, for the transportation of the "through grain" across the river, and the offer should be accepted, what relief would shippers have, or how could they, under these congressional laws, defeat the arrangement? It may at once be seen that the contract involved in this suit is not in conflict with these laws.

That the public commercial policy of the country favors continuous transportation may be conceded. But that policy is enforced by no laws, either of legislative enactments or judicial recognition. Contracts in contravention of a general policy of this character are not invalid. These remarks will be understood as applying to roads in different States, and not to the roads of this State.

XVI. We conclude, upon the foregoing consideration of the merits of the case, that plaintiffs are entitled to recover the lawful damages which they have sustained, on account of the non-performance by defendants of their covenants in the contract. They are entitled to judgment in this action for whatever sum may be determined upon the evidence to be justly due them. As we have seen, this is a law case prosecuted by equitable proceedings. The relief given to plaintiffs must be such as is demanded by the facts of the case, and authorized by the law applicable thereto. Such relief is just compensation in damages for

the loss sustained by the defendants' breach of the contract. The order of the court appointing a referee and requiring reports by defendants of the amount of grain, subject to the contract, transported upon the railroad, cannot be sustained. The plaintiffs are not, under the law applicable to the case, entitled to such relief. It affects the substantial rights of defendants, and must, therefore, be denied.

XVII. We have noticed all of the points made upon defendants' appeal, and will now proceed to consider those arising upon the appeal of plaintiffs, which relate, exclusively, to the amount of the judgment rendered in this case. The damage allowed is only such as the court found plaintiffs were entitled to recover on account of loss of profits which would have resulted, had the "through grain" been delivered, from the receipt of one cent per bushel for handling it. The amount of the judgment is $57,750. We are of the opinion that this sum is properly allowed for this item of damage. We have carefully considered the evidence, and are satisfied that the conclusion is well supported by the facts disclosed. No damage, however, was allowed for loss of profit resulting from plaintiffs being deprived of the storage of grain. It was refused as being remote, uncertain and speculative. In this we think the court erred.

*17. —— measure of damages.*

The storage of grain was a part of the business contemplated by the contract, and was an inducement thereto. It cannot be doubted that the parties to the contract contemplated that plaintiffs would reap profits therefrom. Suppose the contract provided that plaintiffs should be paid for no other services than for storage, can there be a doubt that recovery in that case could not be had therefor?

If plaintiffs could not recover they would be remediless, and the contract would afford them no protection. If they in that case could recover, they can in this. The damages are no more remote, uncertain and speculative, under the contract, as it stands, than in the case supposed. Upon

the proof they do not appear to be objectionable on this ground. They are established with reasonable accuracy, quite as much so as are the damages allowed by the district court. There is not entire certainty as to the amount that ought to be allowed, but this is no reason why none should be given. The law is satisfied with a just and fair approximation to the true amount. In our opinion, the evidence satisfactorily establishes that, for the time covered by the judgment, plaintiffs' loss, under the provision of the contract relating to storing, is $11,250, and we, therefore, allow that sum.

Mr. Justice COLE is unable to concur upon this point with the majority of the court, and is of the opinion that the damages should be restricted to the loss sustained by plaintiffs, on account of their being deprived of the handling of "through grain" at one cent per bushel.

XVIII. Counsel for plaintiffs insist that interest should have been allowed *eo nomine*, and assessed as a part of the damage. In support of this position, they cite *Mote* v. *The C. & N. W. R. Co.*, 27 Iowa, 22. Without doubting the rule announced in that case, we are not prepared to apply it to this. The facts upon which recovery of interest was there allowed are very different from those which are presented in the case at bar. But while we decline to apply the rule of the case cited, and allow interest *eo nomine*, we are of the opinion that interest may be considered as an element of damage under the rule which permits its allowance in order to arrive at the sum which will be a just and lawful compensation for the injury sustained. It is true that, practically, the result is the same as though interest were allowed *eo nomine*. But all cases of unliquidated damages do not demand the application of the rule. In such cases interest may be withheld which could not be done if the rule required its allowance, *eo nomine*, in cases of this character. We base our conclusion here stated upon the following

authorities: *Survivor of Holmes & Co.* v. *Misroon*, 1 Const. 21; 3 Brev. 209; *Suydam et al.* v. *Jenkins*, 3 Sand. 614; *Hyde* v. *Stone*, 7 Wend. 354; *Beals* v. *Gurnsey*, 8 Johns. 446; *Kenedy* v. *Whitwell et al.*, 4 Pick. 466.

In view of the peculiar facts of the case, the majority of the court are of the opinion that interest ought not to be allowed in this case. It is believed that the amount of damages allowed by the judgment which we render in this case is a full and adequate compensation for the loss sustained by plaintiffs.

XIX. Plaintiffs' claim for damages covers loss of profits resulting from the deprivation of the business of shelling corn, sacking grain, etc., which it is insisted they are entitled to recover. The evidence is not sufficiently certain to authorize the allowance of these items of damages. They have not been allowed for this reason. We express no opinion upon the question as to whether they constitute a valid claim for damages.

XX. Plaintiffs demanded, in the court below, that the judgment should require payment thereof to be made in **19. Legal tender: treasury notes.** coin, and renew the claim in this court, relying upon *Hepburn* v. *Griswold*, 8 Wall. 603. This court has held, in several cases, that the act of congress of July 16, 1862, making United States treasury notes legal tender in payment of debts contracted both before and after the enactment of that law, is constitutional. *Warnibold* v. *Schlicting*, 16 Iowa, 243; *Troutman* v. *Gowing*, id 415; *Hentrager* v. *Bates*, 18 id. 174; *Mulligan* v. *Hentrager*, id. 171; *Wilson* v. *Triblecock*, 23 id. 331.

Under the doctrine that this court has uniformly recognized, plaintiffs' judgment may be paid in the currency, which is made a legal tender by the laws of congress.

But the doctrine of *Hepburn* v. *Griswold* no longer prevails in the United States supreme court, having been overruled by the recent legal tender cases, *Knox* v. *Lee* and

*Parker* v. *Davis*, 11 Wall. 682. It must be understood that, with the later ruling of the United States supreme court according with our own, we regard the question as finally and definitely settled.

XXI. The judgment entered in this court covers all damages accruing up to the 1st day of May, 1870, which

20. PRACTICE: mistake in forum. was subsequent to the commencement of the suit, or to the filing of the petition, upon which recovery is had. This would not have been permitted in an action at law, but accords with the practice and rules of the chancery courts. Under these rules the case was tried in the court below as an equitable proceeding. It retains its character in this court, and has been tried here *de novo.* The defendants, failing at the proper time to object to the form in which the action has been prosecuted, as we have before pointed out, are presumed to have waived objections and assented to the cause proceeding as an equitable action. In this view of the case, the judgment may properly cover damages accruing since the commencement of the suit. For the same reason we direct judgment to be entered in this court, instead of remanding the cause to the district court for further proceedings.

Judgment will be entered in this court in favor of plaintiffs for the sum of $69,000. It will draw interest from February 20, 1871, and will be without prejudice to plaintiffs' claim for damages after the 1st day of May, 1870. The order of the district court, appointing a receiver and requiring reports from defendants, etc., is reversed, otherwise the case will stand as

Modified and affirmed.

MILLER, J., dissenting from the ruling upon the right of defendants to a jury trial.

COLE, J., dissenting from the conclusion allowing damage for loss of profits on account of plaintiffs being deprived of the storage of grain.